**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559
L.P. Harrison 3rd (LH 5540)
Turner P. Smith (TS 8052)
Jerrold L. Bregman (JB 0784)

*Attorneys for the Debtors and Debtors-in-Possession*
  *and Source Enterprises, Inc., the Reorganized Debtor*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                              :
In re:                                        :    Case No. 1:07-cv-10375 (SHS)
                                              :
SOURCE ENTERPRISES, INC., et al.,             :    USBC No. 06-11707 (AJG)
                                              :
                Debtors.                      :
                                              :
------------------------------------------------------------x

---

## APPELLEE'S BRIEF

---

## TABLE OF CONTENTS

Page(s)

I. JURISDICTION .................................................................................................... 1

II. ISSUES PRESENTED FOR REVIEW .............................................................. 1

III. STATEMENT OF THE APPEAL .................................................................... 4

IV. STATEMENT OF FACTS ................................................................................ 6

      A.    Overview of Debtors' Cases and Plan Confirmation ......................... 6

      B.    Consummation of the Plan ................................................................ 9

V. STANDARD OF REVIEW ................................................................................ 10

VI. ARGUMENT ................................................................................................... 11

  1.    Windels Marx's Appeal Is Moot And Should Be Dismissed ........................... 11

      A.    The Presumption of Equitable Mootness Arises Under the Facts and
             Circumstances of this Case and is Not Rebutted by Windels Marx .................. 13

      B.    Windels Marx's Failure to Seek a Stay of the Confirmation Order
             Creates a Presumption of Mootness that Windels Marx Cannot
             Overcome ........................................................................................ 15

      C.    Effective Relief Cannot Be Afforded Without Unraveling Complex
             Transactions and Jeopardizing the Reorganized Debtor's Re-Emergence
             as a Revitalized Corporate Entity .................................................... 16

      D.    Parties Who Would Be Adversely Affected Have Not Had An
             Opportunity To Participate ............................................................... 17

  2.    The Bankruptcy Court Did Not Err In Ordering Substantive Consolidation in the
      Debtors' Cases ................................................................................................ 17

  3.    The Bankruptcy Court Did Not Err In Including The Affiliated Debtors in the
      Debtors' Cases ................................................................................................ 20

  4.    The Bankruptcy Court Did Not Err In Confirming the Plan Even if Certain
      Debtors Had Not Complied With Their By-Laws' Procedural Requirements ................. 22

  5.    The Bankruptcy Court Did Not Err In Confirming the Plan that Placed General
      Unsecured Creditors of Different Debtors in the Same Class ......................... 24

  6.    The Existence of the Third-Party Agreement Did Not Violate Either Section
      1123 or 1127 of the Bankruptcy Code Because It Did Not Change the Treatment
      of Any Claims or Modify the Plan .................................................... 25

VII. CONCLUSION .............................................................................................. 28

<u>TABLE OF AUTHORITIES</u>

**Cases**

*ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Communications Corp.),*
 367 B.R. 84 (S.D.N.Y. 2007) ................................................................................................. 10

*Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.),*
 94 F.3d 772 (2d Cir. 1996) ................................................................................................... 16

*Allstate Ins. Co. v. Hughes,*
 174 B.R. 884 (S.D.N.Y. 1994) .............................................................................................. 13

*Arctic Fin. Corp. v. Kenwin Shops, Inc. (In re Kenwin Shops),*
 No. 99 Civ. 10485 MBM, 2000 WL 351404 (S.D.N.Y. Apr. 5, 2000) ................................... 14

*Deutsche Bank, AG v. Metromedia Fiber Network, Inc.*
 *(In re Metromedia Fiber Network),*
 416 F.3d 136 (2d Cir. 2005) ................................................................................. 11, 12, 15

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),*
 10 F.3d 944 (2d Cir. 1993) ............................................................................................. passim

*Goldman, Sachs & Co v. Esso Virgin Is., Inc. (In re Duplan Corp.),*
 212 F.3d 144 (2d Cir. 2000) ................................................................................................. 11

*Herbert Construction Co, Inc. v. Greater New York Savings Bank (In re 455 CPW*
 *Associates), No. 96 CIV. 368 (DAB), 1999 WL 675972 (S.D.N.Y. Aug. 31, 1999)* ................. 10

*In re Adorn Glass & Venetian Blind Corp.,*
 No. 05 Civ. 1890, 2005 WL 3481325 (S.D.N.Y. Dec. 16, 2005) ............................................ 23

*In re American Globus Corp.,*
 195 B.R. 263 (Bankr. S.D.N.Y. 1996) .................................................................................... 23

*In re Drexel Burnham Burnham Lambert Group, Inc.,*
 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ............................................................................ 24

*In re Spiegel, Inc.,*
 Case No. 03-11540, 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006) ............................. 13

*In re Stone & Webster, Inc.,*
 286 B.R. 532 (Bankr. D. Del. 2002) ...................................................................................... 22

*In re Sunbeam Corp.,*
 *2006 WL 1116099 (2d Cir. Apr. 26, 2006)* ........................................................................... 16

*In re The Leslie Fay Cos.,*
 207 B.R. 764 (Bankr. S.D.N.Y. 1997) .................................................................................... 19

*In re UNR Indus., Inc.,*
 20 F.3d 766 (7th Cir. 1994) ............................................................................................ 12, 13

*In re WorldCom, Inc.,*
 No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .................................... 18

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
 843 F.2d 636 (2d Cir. 1988) ................................................................................................. 10

*Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines),*
 374 B.R. 516 (S.D.N.Y. 2007) .......................................................................................... 13, 14

4278270

*Loral Stockholders Protective Comm. v. Loral Space & Communications Ltd.*
   *(In re Loral Space & Communications, Ltd.),*
   342 B.R. 132 (S.D.N.Y. 2006) ................................................................. 17

*Manges v. Seattle-First Nat'l Bank (In re Manges),*
   29 F.3d 1034 (5th Cir. 1994) ............................................................ 12, 13

Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. Official
   Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.),
   988 F.2d 322 (2d Cir. 1993) ....................................................................... 16

*Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.,*
   866 F.2d 228, (7th Cir. 1988), *cert. denied,* 493 U.S. 847 (1989)........................... 10

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),*
   68 F.3d 26 (2d Cir. 1995) ........................................................................... 12

*Robinson v. Sunbeam Corp. (In re Sunbeam Corp.),*
   Case No. 01-40291 (AJG), 2004 WL 136941 *3 (S.D.N.Y. Jan. 27, 2004) ...................... 16, 17

*Robinson v. Sunbeam Corp.,*
   *127 S.Ct. 252, L.Ed.2d 257, 75 USLW 3036 (U.S. Oct. 2, 2006)* ............................. 16

*Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.,*
   324 F.3d 197 (3d Cir. 2003) ..................................................................... 27

*Soviero v. Franklin Nat'l Bank,*
   328 F.2d 446 (2d Cir. 1964) .................................................................... 22

*TWA, Inc. v. Texaco, Inc. (In re Texaco, Inc.),*
   92 B.R. 38 (S.D.N.Y. 1988)...................................................................... 12

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Banking Co., Ltd.),*
   860 F.2d 515 (2d Cir. 1988) ................................................................... 18

*WBHA Real Estate Ltd. Partnership v. Lafayette Hotel Partnership*
   *(In re Lafayette Hotel Partnership),*
   227 B.R. 445 (S.D.N.Y. 1998)............................................................... 10, 11

iii

**Rules**

Fed R. Bankr. P. 8013 ................................................................................................ 10

Fed. R. Bankr. P. 8017(a) ........................................................................................... 9

**Statutes**

28 U.S.C. § 1334 ......................................................................................................... 1

28 U.S.C. § 157(b) ...................................................................................................... 1

28 U.S.C. § 158(a)(1) .................................................................................................. 1

11 U.S.C. § 101 ........................................................................................................... 1

11 U.S.C. § 341 ......................................................................................................... 21

11 U.S.C. § 1122 .................................................................................................... 3, 23

11 U.S.C. § 1123 ............................................................................................... 3, 22, 27

11 U.S.C. § 1126(g) .................................................................................................... 8

11 U.S.C. § 1127 .................................................................................................... 4, 27

11 U.S.C. § 1129 ............................................................................................... 1, 5, 10

This is the brief of Appellee, formerly the debtors and debtors-in-possession and now Source Enterprises, Inc., the reorganized debtor (the "Reorganized Debtor"), which emerged from bankruptcy in the above-captioned Chapter 11 cases pursuant to the *Fourth Amended Plan of Reorganization of the Source Debtors*, dated August 22, 2007 (the "Plan"). The Plan was confirmed by order of the United States Bankruptcy Court for the Southern District of New York, Judge Arthur J. Gonzalez presiding (the "Bankruptcy Court"), by order entered on October 1, 2007 (the "Confirmation Order"), pursuant to Section 1129 of Title 11, United States Code § 101 *et seq.* (as amended, the "Bankruptcy Code"). This brief responds to the brief of the Appellant, Windels, Marx, Lane & Mittendorf, LLP ("Windels Marx").[1]

## I.
## JURISDICTION

The Bankruptcy Court had jurisdiction over the Debtors' reorganization proceedings pursuant to 28 U.S.C. § 1334 (bankruptcy cases and proceedings) and 28 U.S.C. § 157(b) (bankruptcy procedures). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1) (bankruptcy appeals).

## II.
## ISSUES PRESENTED FOR REVIEW

1.     Did the confirmation of the Plan, followed by (i) Windels Marx's failure to request a stay of the effectiveness of the Confirmation Order, (ii) the occurrence of the Effective Date under the Plan, (iii) the substantial consummation of the Plan, and (iv) the reliance upon the effectiveness of the Plan by the Reorganized Debtor and third parties, including investors, creditors, suppliers and employees, have the effect of mooting the appeal pursuant to the doctrine of "equitable mootness". Specifically,

    (a)    Windels Marx did not request a stay of the Confirmation Order from the Bankruptcy Court or otherwise pursue any available remedies to stay the effectiveness of the Plan;

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Plan.

4278270

(b)     the Effective Date of the Plan occurred on October 31, 2007, at which time (i) all of the Debtors' previously existing equity interests were cancelled and extinguished, (ii) the Debtors' obligations to their debtor-in-possession secured lender were cancelled, (iii) investors received the new equity of the Reorganized Debtor and paid more than $1.4 million of their plan funding commitment, including $400,000 to the liquidating trust established under the Plan for the benefit of holders of allowed general unsecured claims (the "Creditors' Trust"), $200,000 to Textron, the Debtors' pre-petition secured lender, and more than $800,000 to pay administrative claims, and (iv) the Creditors' Trust Agreement was executed by the Debtors and the Trustee of the Creditors' Trust (the "Trustee"); and

(c)     the Reorganized Debtor and numerous entities entered into agreements in reliance on the Reorganized Debtor's emergence from the uncertainty of Chapter 11 proceedings, including, without limitation, the Trustee who retained professionals and commenced to undertake the business of the Creditors' Trust, and the Reorganized Debtor, who entered into myriad business relationships with suppliers, vendors, employees, customers, professionals and other parties as it operated its business, including publishing *The Source* magazine through various channels on a monthly basis.

2.     If the appeal is not moot, did the Bankruptcy Court err in confirming the

Debtors' Plan for any of the following reasons:

(a)     Because the Plan effectuated the substantive consolidation of the Debtors where the factual record established (i) that creditors dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit, (ii) the economic reality was that the Debtors' books and records were incapable of being untangled from one another, including because there were no separate financial records for any of the Debtors other than Enterprises for a period of more than two years prior to their bankruptcy filing, and (iii) the benefits of substantive consolidation in the Debtors' cases were found to far outweigh any possible harm to creditors; or

(b)     Because among the Debtors were distinct legal entities that had not separately filed voluntary petitions for relief under the Bankruptcy Code or had bankruptcy petitions filed against them (the "Affiliated Debtors"), where the factual record established that (i) no objections were filed to the inclusion of the Affiliated Debtors as "Debtors" for all purposes in the Debtors' cases, (ii) no objections were filed to the Debtors' motion to jointly administer the Debtors' Chapter 11 cases (the "Joint Administration Motion"), (iii) no appeal was filed with respect to the Bankruptcy Court's Order approving the Joint Administration Motion, (iv) no objections were filed to the Debtors' motion to apply certain orders that had previously been entered in Enterprises' Chapter 11 case to other Debtors (the "Application of Orders Motion"), (v) no appeal was filed with respect to the Bankruptcy Court's Order approving the Application of Orders Motion,

(vi) no objections were filed with respect to the *Source Debtors' Second Amended and Consolidated Summary of Schedules, Schedules and Statement of Financial Affairs* [Docket No. 252] (the "*Debtors' Consolidated Schedules*"), which provided comprehensive financial disclosure for all of the Debtors on a consolidated basis and was filed in their jointly administered Chapter 11 cases, (vii) no objections were filed to any of the Monthly Operating Statements, which provided comprehensive financial disclosure of the results of the Debtors' business operations on a monthly basis for all of the Debtors on a consolidated basis and which were filed in their jointly administered Chapter 11 cases, and (viii) the overwhelming majority of the Affiliated Debtors did not have unique employer or taxpayer identification numbers; or

(c)  Because the Debtors included distinct legal entities whose governing bodies may have not approved their filing of voluntarily petitions for relief under Chapter 11 of the Bankruptcy Code in the fashion prescribed by their respective by-laws, where the factual record established that (i) no objections were filed to the commencement of the Debtors' Chapter 11 cases, (ii) no director or equity holder of any of the Debtors has appealed the Confirmation Order, (iii) no objections were filed to the Debtors' Joint Administration Motion, (iv) no appeal was filed with respect to the order approving the Joint Administration Motion, (v) no objections were filed to the Debtors' Application of Orders Motion, (vi) no appeal was filed with respect to the order approving the Application of Orders Motion, (vii) no objections were filed with respect to the Debtors' Consolidated Schedules, which provided comprehensive financial disclosure for all of the Debtors on a consolidated basis and was filed in their jointly administered Chapter 11 cases, (viii) no objections were filed to any of the Monthly Operating Statements, which provided comprehensive financial disclosure of the results of the Debtors' business operations on a monthly basis for all of the Debtors on a consolidated basis and which were filed in their jointly administered Chapter 11 cases, and (ix) the overwhelming majority of the Affiliated Debtors did not have unique employer or taxpayer identification numbers; or

(d)  Because the Plan placed general unsecured creditors of different Debtors in the same class, resulting in the common classification of claims that are not "substantially similar" in violation of Section 1122(a) of the Bankruptcy Code, where the factual record established (i) that creditors dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit and (ii) the economic reality was that the Debtors' books and records were incapable of being untangled from one another, including because no one maintained any separate financial records for any of the Debtors other than Enterprises for a period of more than two years prior to their bankruptcy filing or thereafter; or

(e)  Because a side agreement between two non-debtor entities, entered into and disclosed to the Bankruptcy Court and all parties-in-interest before the Confirmation Hearing (the "Third-Party Agreement"), resulted in disparate treatment of claims within the same class in violation of Section 1123(a)(4)

3

of the Bankruptcy Code, where one of the parties to the Third-Party Agreement was the entity that would be funding the Plan (the "Plan Funder") and the other was a third-party (the "Third-Party Investor") that happened to be affiliated with one of the Debtors' creditors ("The McMillan Firm"), pursuant to which the Third-Party Investor agreed to buy from the Plan Funder a minority stake in the new equity of the Reorganized Debtor after the Effective Date, where the factual record established that (i) the Third-Party Agreement did not involve property of the Debtors' estates, (ii) the Plan Funder had a valid business reason to enter into the Third-Party Agreement with the Third-Party Investor but not other third-parties, including creditors in the Debtors' cases, (iii) the Third-Party Agreement contained no provision concerning or changing the treatment of The McMillan Firm's claim, or any other claim, in the Debtors' cases or under their Plan, (iv) the treatment of The McMillan Firm's claim under the Plan did not change as a result of the Third-Party Agreement, and (v) The McMillan Firm's claim was classified and treated under the Plan in exactly the same way as were all other general unsecured claims; or

(f)    Because the Third-Party Agreement resulted in a modification of the Plan and violated Sections 1127(a), (c), (d), (f)(1) and (f)(2) of the Bankruptcy Code, by changing the treatment of The McMillan Firm's claim, where the factual record established that (i) the Third-Party Agreement contained no provision concerning the treatment of The McMillan Firm's claim in the Debtors' cases or under their Plan, (ii) the Plan's treatment of The McMillan Firm's claim, and all other claims, did not change as a result of the Third-Party Agreement, and (iii) The Plan classified and treated The McMillan Firm's claim exactly the same as all other general unsecured claims.

### III.
### STATEMENT OF THE APPEAL

Windels Marx, the Debtors' former bankruptcy lawyers who withdrew from the Chapter 11 case in January 2007 over a fee dispute, appeals the Confirmation Order that the Bankruptcy Court entered on October 1, 2007. Among other things, the Plan provides for the substantive consolidation of the Debtors' estates and the Reorganized Debtor's emergence from bankruptcy on the Effective Date. The Effective Date of the Plan occurred on October 31, 2007. Windels Marx never requested or received any stay of the Confirmation Order.

In its Appellant's Brief, Windels Marx requests that this case be remanded to the Bankruptcy Court for purposes that are not clearly explained. While Windels Marx takes issue with the substantive consolidation feature of the Plan, it does not point to anything in the record

4278270

suggesting that a new or revised plan of reorganization – assuming, for argument's sake, that the clock somehow could be turned back to October 2007 – would be feasible without including all of the Debtors and substantively consolidating their assets and liabilities under a joint Chapter 11 plan of reorganization.  Similarly, Windels Marx provides no explanation as to how the Bankruptcy Court could possibly adjudicate the assets and liabilities of each of the various Debtors, exclude some Debtors from the consolidation, or segregate claims on a debtor-by-debtor basis, in light of the fact there are no financial records distinguishing among the Debtors for at least two years before bankruptcy, and creditors regarded the Debtors as a single economic entity as did the Debtors themselves.

At its core, this appeal is but the latest step in the quixotic effort of Windels Marx to extract the payment of its disputed legal fees and expenses which exceed $500,000 and were the subject of a three-day contested hearing before the Bankruptcy Court in November and December 2007.  Windels Marx's litigation campaign began shortly after withdrawing from the Chapter 11 case and includes the commencement of two separate adversary proceedings (both of which have since been withdrawn following defendants' motions to dismiss), a motion to compel payment of fees and expenses that were the subject of a fee application that was already pending at the time and which fees were hotly disputed, and objections at every step down the road to the Plan's confirmation, including a two-day contested Confirmation Hearing.  All the while, Windels Marx made it known that they would withdraw their opposition to practically everything the Debtors proposed upon being paid their disputed administrative claim for attorneys' fees and expenses.[2]

---

[2] Were Windels Marx's administrative claims bona fide, and likely to be allowed, one would have expected Windels Marx to be a staunch proponent of confirmation of the Plan – or any Chapter 11 plan in the Debtors' cases for that matter – in light of Section 1129(a)(9) of the Bankruptcy Code, which requires that administrative claims be paid in cash in full on the effective date of the plan unless the holder agrees to less favorable treatment.  Windels Marx's behavior in the Debtors' cases is explainable as nothing more than a litigation tactic that has wrongfully co-opted and squandered the valuable resources of the federal judiciary and the Debtors.

**IV.**
**STATEMENT OF FACTS**

    ***A.***      ***Overview of Debtors' Cases and Plan Confirmation***

        The Debtors were engaged, and now the Reorganized Debtor is engaged, in the business of publishing the monthly magazine known as *The Source* and, from time to time, *The Source Latino*. *The Source* contains articles, interviews, promotions and advertisements pertaining to the "hip hop" music industry as well as popular culture and politics. The Debtors also engaged in related businesses, such as the licensing of Enterprises' trademarks, trade names and/or service marks for use in connection with (i) the licensing and promotion of audio and video programming, such as the "Hip Hop Hits" series, (ii) Source-branded DVD and CD products, and (iii) the sale of diverse products, including "ring tones" and "wallpaper" for mobile telephones and computers, and even clothing. At its height in 2002/2003, circulation of *The Source* magazine was approximately 500,000 issues per month.

        The Debtors' financial woes are traceable to the actions and omissions of David Mays, their former President and CEO, under whose leadership, or lack thereof, the Debtors suffered severe financial reversals leading up to the judicial foreclosure sale that precipitated Enterprises' involuntary bankruptcy filing. Among other things, the Debtors' prior management engaged in contentious conduct with third parties that resulted in lost advertising, negative publicity and reduced newsstand sales. Moreover, prior management allowed the Debtors to issue checks without available funds on deposit to pay them, wire transfer funds without internal controls, often for no consideration, ignore creditors' payment demands, and harass and discriminate against employees which resulted in dozens of law suits and multi-million dollar judgments against the Debtors.

        Enterprises' involuntary bankruptcy petition under Chapter 7 was filed by three of its creditors on July 27, 2006, the same day as a scheduled foreclosure sale of substantially all of its assets. On August 21, 2006, Enterprises moved the Bankruptcy Court for an order converting

6

the involuntary Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code (the "Conversion Motion"). The Bankruptcy Court granted the Conversion Motion at the hearing on September 20, 2006, and the order, constituting the order for relief in Enterprises' case, was entered on September 21, 2006. On April 27, 2007, the Debtors other than Enterprises filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On May 8, 2007, the Bankruptcy Court entered the Order approving the Joint Administration Motion, pursuant to which the Court ordered that the Debtors' cases be administered jointly. On May 11, 2007, the Bankruptcy Court entered an Order approving the Application of Orders Motion, which decreed that virtually all of the substantive orders entered in Enterprises' case shall be deemed to apply to the Debtors other than Enterprises.

The Bankruptcy Court approved the Disclosure Statement and related relief by Order entered August 23, 2007. The Bankruptcy Court confirmed the Plan following a two-day contested Confirmation Hearing in September 2007 at which the Debtors presented extensive testimony establishing the satisfaction of each of the elements required for confirmation of the Plan under Section 1129 of the Bankruptcy Code. The testimony of certain officers and directors of the Debtors, submitted through declarations and adduced through live examination, substantiate each of the facts that is recited above as having been established in the record in the Debtors' cases. The Bankruptcy Court accepted this evidence and confirmed the Plan.

The Plan is the product of agreements (collectively, the "Plan Agreement") by and among the Debtors, significant creditors and the Debtors' preferred shareholders. The Plan was crafted by the parties to provide for a viable reorganization for the Debtors and equitable allocation of value among creditors. The parties to the arms'-length and good faith negotiations that led to the Plan Agreement embodied in the Plan include the Debtors, Textron (the Debtors' pre-petition secured lender), the Committee, which represented all unsecured creditors, and

7

BE/GS (the Plan Funder, defined above, as well as the court authorized DIP Lender and holder of the Debtors' preferred equity shares).

The Plan provided for the restructuring of the Debtors and allocation of significant value to their creditors; all equity interests in the Debtors that existed as of the Debtors' respective petition dates were cancelled and received nothing under the Plan; and all allowed administrative and priority claims were paid in full on the Effective Date or as soon thereafter as such claims were (or are) allowed. In addition, the Plan provided for Textron to receive a payment of $200,000 in cash on the Effective Date plus periodic payments totaling an amount less than the full amount of its claim, plus 15% of the equity of the Reorganized Debtor. The Plan also provided for the creation of the Creditors' Trust which, on the Effective Date, received the Debtors' claims against certain third parties plus cash of $400,000 and other consideration. The DIP Parties (which include the Plan Funder) received under the Plan, in satisfaction of the $3 million DIP Facility and for funding the Plan, 85% of the new equity of the Reorganized Debtor and releases. The Plan also provided for the rejection, or the assumption and assignment to the Reorganized Debtor, of certain executory contracts and unexpired leases. In addition, the Plan provided for the substantive consolidation of the Debtors. Under the Plan, the Debtors' assets were pooled, all of the creditors were treated as though their claims were against the same Debtor without regard to any distinction among the Debtors, and the consolidated Debtors emerged from bankruptcy with the Reorganized Debtor as the sole surviving entity.

The Plan was accepted overwhelmingly by the creditors in all classes of Impaired Claims who were entitled to vote. More than 93% of the creditors holding general unsecured claims (more than 99% in amount) voted to accept the plan as did more than 95% of the Subscribers. The Plan was deemed rejected by the remaining two classes, consisting of equity security holders' interests, because all equity interests were canceled and received nothing under

4278270

the Plan and were deemed to reject the Plan under Section 1126(g) of the Bankruptcy Code.

Two objections to the Plan were filed, one by Windels Marx and one by David Mays ("Mays"),

the Debtors' former President and CEO whose own Chapter 7 bankruptcy case in New Jersey

was recently closed. The Bankruptcy Court overruled these objections and confirmed the Plan.

### B.    Consummation of the Plan

Pursuant to the Confirmation Order and Fed. R. Bankr. P. 8017(a), which permits

a plan of reorganization to be consummated 10 days after confirmation unless stayed, the

following actions (the "Reliance Actions") were taken on and after the Effective Date of October

31, 2007:

| | |
|---|---|
| (i) | The Reorganized Debtor filed and served on all parties-in-interest a notice of the occurrence of the Effective Date; |
| (ii) | All previously existing equity interests in the Debtors were cancelled and extinguished; |
| (iii) | The Debtors' obligations to their debtor-in-possession secured lender were cancelled; |
| (iv) | The transfers that were contemplated to be made under the Plan by the Debtors on the Effective Date were effectuated, including (i) certain causes of action and $400,000 in cash to the Creditors' Trust, (ii) $200,000 to Textron, and (iii) more than $800,000 to holders of administrative claims; |
| (v) | Stock certificates evidencing 85% of the equity of the Reorganized Debtor and 15% of such equity were issued to the Plan Funder and Textron, respectively; |
| (vi) | The Creditors' Trust Agreement was executed by the Debtors and the Trustee, and the Trustee commenced to administer the Creditors' Trust and retain professionals; |
| (vii) | The Reorganized Debtor filed an amended and restated certificate of incorporation and adopted new by-laws; |
| (viii) | Officers and board of directors of the Reorganized Debtor were named; |
| (ix) | The Reorganized Debtor and Textron entered into the Textron Note and associated security documents; and |
| (x) | The Reorganized Debtor, having succeeded the Debtors pursuant to the Plan, commenced business operations, including publishing *The Source* |

magazine on a consistent monthly basis, and executing and performing certain agreements with vendors, suppliers, employees and professionals.

Each of the Reliance Actions was undertaken in reliance on the finality of the Confirmation Order and effectiveness of the Plan. The Reorganized Debtor and numerous other parties-in-interest have materially changed their positions in reliance on the Plan and on the actions of others who relied on the effectiveness of the Plan.

## V.
## STANDARD OF REVIEW

Federal Rule of Bankruptcy Procedure 8013 provides that orders issued by a bankruptcy court are subject to appellate review. Fed. R. Bankr. P. 8013. A district court serves as an appellate court in reviewing a bankruptcy court's judgments. *ACC Bondholder Group v. Adelphia Commc'ns Corp.*, 367 B.R. 84, 90 (S.D.N.Y. 2007). The district court reviews the bankruptcy court's findings of fact under a clearly erroneous standard with deference given to the bankruptcy court because of the "court's expertise and superior position to make determinations of credibility." *Herbert Construction Co, Inc. v. Greater New York Savings Bank (In re 455 CPW Assocs.)*, No. 96 CIV. 368 (DAB), 1999 WL 675972, at *2 (S.D.N.Y. Aug. 31, 1999); *see also WBHA Real Estate Ltd. Partnership v. Lafayette Hotel Partnership (In re Lafayette Hotel Partnership)*, 227 B.R. 445, 448 (S.D.N.Y. 1998). Moreover, where a plan confirmation order determining that the elements of Section 1129 of the Bankruptcy Code have been satisfied, as in the instant case, then, in considering such arguments on appeal, "we bear in mind that the Bankruptcy Judge's findings of fact may not be overturned unless clearly erroneous." *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648 (2d Cir. 1988). *See also Herbert Constr.*, 1999 WL 675972, at *2 ("To be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old unrefrigerated dead fish." (quoting *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988), *cert. denied*, 493

10

U.S. 847 (1989)).  By contrast, a bankruptcy court's conclusions of law are reviewed *de novo*.

*Lafayette Hotel Partnership*, 227 B.R. at 449; *see also Goldman, Sachs & Co v. Esso Virgin Is.,*

*Inc. (In re Duplan Corp.)*, 212 F.3d 144, 151 (2d Cir. 2000).

   Significantly, the factual record on appeal consists solely of evidence submitted

by the parties in support of the Plan; the record contains no evidence whatsoever in opposition to

the Plan.  Windels Marx submitted no evidence, and the record contains none, controverting any

of the factual conclusions the Bankruptcy Court reached after considering the evidence submitted

in support of the Plan at the Confirmation Hearing.  Since Windels Marx has failed to come

forward with evidence, its arguments that any of the Bankruptcy Court's findings of fact are

clearly erroneous should be summarily rejected as Windels Marx has not, and cannot,

demonstrate that any such factual findings are clearly wrong.

   As demonstrated herein, Windels Marx has failed to demonstrate that the

Bankruptcy Court committed reversible error with respect to any questions of law or fact.

Accordingly, having failed to satisfy its burden of proof on appeal, Windels Marx' appeal should

be either dismissed under the equitable mootness doctrine or overruled on the merits, as

discussed below.

**VI.**
**ARGUMENT**

**1.**  **Windels Marx's Appeal Is Moot And Should Be Dismissed**

   Windels Marx's appeal should be dismissed because it has been rendered moot

pursuant to the "equitable mootness" doctrine recognized in *Frito-Lay, Inc. v. LTV Steel Co. (In*

*re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir. 1993), in order to "avoid disturbing a reorganization

plan once implemented."  *Deutsche Bank AG, London Network v. Metromedia Fiber Network,*

*Inc. (In re Metromedia Fiber Network)*, 416 F.3d 136, 144 (2d Cir. 2005) (citing cases).  The

doctrine of equitable mootness is supported by well-established public policy that promotes the

orderly administration of a debtor's bankruptcy estate by affording finality to orders of the

11

bankruptcy court. *TWA, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 92 B.R. 38, 45-46 (S.D.N.Y. 1988); *see Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26, 30 (2d Cir. 1995) ("An appeal is also moot when 'even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'") (internal citation omitted); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("In common with other courts of appeals, we have recognized that a plan of reorganization, once implemented, should be disturbed only for compelling reasons.") (*quoted in Metromedia*, 416 F.3d at 144).

In fact, where the appellant does not request a stay pending appeal, as in the instant case, there is a strong presumption of mootness.

The origin of the mootness doctrine is the "fundamental jurisdictional tenet that Federal courts are empowered only to hear live cases and controversies." *Texaco*, 92 B.R. at 45. Indeed, Article III of the U.S. Constitution requires that a court abstain from proceeding to formal judgment and dismiss a pending appeal if the court cannot grant a plaintiff any effectual relief. *Id*. This Constitutional principal applies with equal force in the context of a bankruptcy appeal. *Id*. Moreover, in circumstances such as those raised by the instant appeal, "equitable principles of jurisprudence may dictate that a case be dismissed as moot even though a court may properly exercise its Article III jurisdiction." *Id*.; *see also Manges v. Seattle-First Nat'l Bank (In re Manges)*, 29 F.3d 1034, 1038-39, n.6 (5th Cir. 1994) (stating that "mootness" in the context of "equitable concerns unique to bankruptcy . . . is not an Article III inquiry as to whether a live controversy is presented; rather, it is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions").[3]

---

[3] The Seventh Circuit opined that the term "equitable mootness" is "misleading" and "breeds confusion" because "[t]here is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome ('equitable mootness')." *UNR*, 20 F.3d at 769. The Court "[a]ccordingly . . . banish[ed] 'equitable mootness' from the (local) lexicon" and framed the issue as follows: "We ask not whether this case is moot, 'equitably' or otherwise, but whether it is prudent to upset the plan of reorganization at this late date." *Id*.

### A.    The Presumption of Equitable Mootness Arises Under the Facts and Circumstances of this Case and is Not Rebutted by Windels Marx

The Second Circuit has recognized that bankruptcy appeals are appropriately dismissed on grounds of equitable mootness in the following two situations:  Either (1) when an unstayed order has resulted in a "comprehensive change in circumstances," or (2) when a plan of reorganization is substantially consummated.  *Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y. 2007), citing *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) *and Chateaugay*, 10 F.3d at 952; *see also Texaco*, 92 B.R. at 46 (identifying a "strong" presumption that appellants' challenges have been rendered moot due to their having "demonstrated an inability or unwillingness to seek a stay").

In the instant case, the appeal is equitably moot on both grounds because, <u>first</u>, myriad parties-in-interest have comprehensively changed their circumstances as a consequence of, and in reliance on, the finality of the Confirmation Order, and <u>second</u>, the Debtors' Plan has been substantially consummated.  The Reliance Actions, described above, illustrate the great extent to which parties-in-interest, including, in particular, the Reorganized Debtor, have comprehensively changed their circumstances in reliance on the effectiveness of the Plan and finality of the Confirmation Order.  *See Chateaugay*, 10 F.3d at 953 (the requested relief would affect "the re-emergence of the debtor as a revitalized corporate entity" and "unravel intricate transactions") (internal citations omitted).

The Reliance Actions also provide evidence of the substantial consummation of the Plan.  *See In re Spiegel, Inc.*, Case No. 03-11540, 2006 WL 2577825 at *15 (Bankr. S.D.N.Y. Aug. 16, 2006) (a plan has been substantially consummated where "substantially all of the property proposed to be transferred pursuant to the plan has in fact been transferred, the reorganized debtor has assumed control of the business, and plan distribution has commenced") (citation omitted).  Specifically, all transfers that were required to be made on or about the Effective Date have been made, which constitutes all of the property that the Debtors are called

13

upon under the Plan to distribute.  Distributions under the Plan have commenced and been made to Textron as well as general unsecured creditors through transfers for their benefit to the Creditors' Trust.  The Reorganized Debtor has also paid other creditors, including certain holders of allowed administrative and priority claims, in excess of $1.4 million.  Moreover, the Reorganized Debtor has emerged from bankruptcy and is conducting business.  Thus, the presumption of equitable mootness has been invoked.  As demonstrated below, Windels Marx cannot overcome this presumption under the facts and circumstances of this case.

It is well recognized in the Second Circuit that in order to overcome the presumption of mootness, the appellant must establish that all five of the following circumstances are present:  (1) the appellant "pursued with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from"; (2) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (3) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (4) the parties who would be adversely affected by the relief requested on appeal have notice of the appeal and an opportunity to participate in the proceedings; and (5) the court can still order some effective relief.  *Delta Air Lines*, 374 B.R. at 522-523 (quoting *Chateaugay*, 10 F.3d at 952-53 (alteration in original) (internal citations omitted)); *see also Arctic Fin. Corp. v. Kenwin Shops, Inc. (In re Kenwin Shops)*, Case No. 99 Civ. 10485 MBM, 2000 WL 351404, at *1 (S.D.N.Y. Apr. 5, 2000).  Significantly, all five of these circumstances must be present to rebut the presumption of equitable mootness.  *Delta Air Lines*, 374 B.R. at 523.  In this case, Windels Marx cannot establish the presence of any of the circumstances that would rebut the presumption of mootness, in particular, because (i) no stay pending appeal was sought, (ii) effective relief cannot be afforded without jeopardizing the Reorganized Debtor's

reorganization and (iii) Windels Marx did not provide the parties-in-interest who would be adversely affected with an opportunity to participate.

      **B.**      ***Windels Marx's Failure to Seek a Stay of the Confirmation Order Creates a Presumption of Mootness that Windels Marx Cannot Overcome***

The failure of Windels Marx to seek a stay of the Confirmation Order is a chief consideration and indicates Windels Marx cannot overcome the presumption of equitable mootness under the facts of this case. As stated by the Second Circuit in *Metromedia Fiber Network*, 416 F.3d at 144, "we insist that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one." The result is based on equitable principles. The Second Circuit has put it this way: "We presume that it will be inequitable or impractical to grant relief after substantial consummation," unless, among other things, "the entity seeking relief has diligently pursued a stay of execution of the plan throughout the proceedings." *Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir. 1996). As such, "the party who appeals without seeking to avail himself of that protection does so at his own risk." *Id.* (citing *Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 326 (2d Cir. 1993)).

      In this case, Windels Marx chose not to seek a stay of the Confirmation Order or to take any other action to stay the effectiveness of the Confirmation Order. As a result, numerous parties-in-interest acted in reliance on the Confirmation Order by participating in the Reliance Actions. Pursuant to the Reliance Actions, millions of dollars of cash and causes of action were conveyed to and for the benefit of creditors, a trust was created and a trustee was appointed, professionals were retained, all parties-in-interest were provided notice of the Effective Date, and a host of additional actions also were taken. The reversal of the Confirmation Order would be inequitable to the Reorganized Debtor and the myriad other

4278270

parties-in-interest who have relied upon the Confirmation Order by participating in the Reliance Actions.

The failure of Windels Marx to seek to stay the effectiveness of the Confirmation Order is fatal to its appeal. This failure conclusively establishes that Windels Marx cannot meet all of the five *Chateaugay* factors and, thus, dismissal of the appeal on the grounds of equitable mootness is required. *See Robinson v. Sunbeam Corp. (In re Sunbeam Corp.)*, No. 01-40291 (AJG), 2004 WL 136941 *3 (S.D.N.Y. Jan. 27, 2004) ("Because appellants cannot meet all of the *Chateaugay* factors, the appeals challenging the bankruptcy court's confirmation of the [Chapter 11 plan] are moot. Accordingly, appellants' appeals must be dismissed."), *aff'd, In re Sunbeam Corp.*, 2006 WL 1116099 (2d Cir. Apr. 26, 2006) (Summary Order, not selected for publication), *cert. denied, Robinson v. Sunbeam Corp.*, 127 S.Ct. 252, 166 L.Ed.2d 257, 75 USLW 3036 (U.S. Oct. 2, 2006). Moreover, with respect to an appellant's failure to seek a stay, this Court held as follows: "Given the lack of action by appellants, equitable considerations require dismissal of the appeals." *Sunbeam*, 2004 WL 136941 *3 (emphasis in original).[4] Thus, Windels Marx's appeal should also be dismissed as moot.

### C.    *Effective Relief Cannot Be Afforded Without Unraveling Complex Transactions and Jeopardizing the Reorganized Debtor's Re-Emergence as a Revitalized Corporate Entity*

In this case, Windels Marx seeks a reopening of the proceedings and a remand to the Bankruptcy Court to revisit whether, *inter alia*, substantive consolidation of the Debtors' estates was appropriate and other matters as indicated in the Appellant's Brief. As a matter of equity, no such relief may be granted without unraveling complex transactions taken in reliance on the finality of the Confirmation Order, including the Reliance Actions, and seriously jeopardizing the Reorganized Debtor's re-emergence as a revitalized entity.

---

[4] Unlike Windels Marx, the appellant in Sunbeam did request a stay pending appeal but the request was mailed after the deadline to move for a stay had passed. *Sunbeam*, 2004 WL 136941 at *3. The conduct of Windels Marx, who never sought at any point a stay pending appeal, evidences even less diligence than that which the Court found to have been inadequate in *Sunbeam*.

4278270

Accordingly, this factor militates against an exception to the equitable mootness doctrine and in favor of dismissal of Windels Marx's appeal. *See Loral Stockholders Protective Comm. v. Loral Space & Communications Ltd. (In re Loral Space & Communications)*, 342 B.R. 132, 140 (S.D.N.Y. 2006).

### D. Parties Who Would Be Adversely Affected Have Not Had An Opportunity To Participate

Another requirement for overcoming the presumption of equitable mootness that Windels Marx has not satisfied is notice to parties who would be adversely affected were the Confirmation Order reversed and remanded. Notice would have had to have been provided to the Debtors' creditors, employees, counterparties to executory contracts and unexpired leases that were rejected, or assumed and assigned to the Reorganized Debtor, vendors and others who relied upon the transactions approved by the Plan. Here, there is no evidence that such notice has been provided. As such, this factor weighs in favor of dismissal of the appeal on equitable mootness grounds. *See In re Loral Space & Communications*, 342 B.R. at 140.

For the foregoing reasons, Windels Marx's appeal should be dismissed on the grounds of equitable mootness alone because it is apparent that Windels Marx cannot satisfy the five *Chateaugay* factors. *Sunbeam*, 2004 WL 136941 at *3.

### 2. The Bankruptcy Court Did Not Err In Ordering Substantive Consolidation in the Debtors' Cases

The Bankruptcy Court did not err in authorizing the substantive consolidation of the Debtors under the facts and circumstances of the Debtors' cases because the evidence submitted and adduced in connection with the Confirmation Hearing established that (i) creditors dealt with the Debtors as a single economic unit and did not rely on their separate identities in extending credit, (ii) the economic reality was that the Debtors' books and records were incapable of being untangled from one another, including, among other things, because there were no separate financial records for any of the Debtors other than Enterprises for a period of

more than two years prior to their bankruptcy filing, and (iii) the benefits of substantive

consolidation in the Debtors' cases were found to far outweigh any possible harm to creditors.

None of the foregoing factual conclusions of the Bankruptcy Court was controverted by any

evidence.  There is no factual record other than that which supports substantive consolidation,

which evidence was presented by the proponents of the Plan at the Confirmation Hearing and

upon which the Bankruptcy Court's decision is based.

    The Second Circuit has made clear that substantive consolidation is required if

one of the two following factors is demonstrated:  "(i) that the operational and financial affairs of

the debtors are so entangled that the accurate identification and allocation of assets and liabilities

cannot be achieved; *or* (ii) that creditors dealt with the debtors as a single economic unit and did

not rely on the separate identity of a debtor in extending credit."  *See In re WorldCom, Inc.*, No.

02-13533, 2003 WL 23861928, at *35-36 (Bankr. S.D.N.Y. Oct. 31, 2003) (quoting *Union Sav.*

*Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Banking Co., Ltd.)*, 860 F.2d 515,

518 (2d Cir. 1988)).

    The factual record which supports substantive consolidation in the instant case

includes the fact that since at least 2004, the Debtors have been operated as a single economic

entity.  For the past several years, all of the economic activity of the Debtors was accounted for

on Enterprises' books and records, none of the other Debtors maintained any books or records or

even a bank account, and Enterprises received all income and made all payments for all of the

Debtors.  Indeed, only consolidated financial results were maintained for the Debtors for the past

few years and none of the other Debtors had its own bank account or employees.  *See*

*Declaration of David Berliner in Support of Confirmation of the Fourth Amended Plan of*

*Reorganization of the Source Debtors* [Docket No. 382] at ¶ 16.  Moreover, the Debtors'

business records reflect that since 2004, all of their financial transactions were accounted for

together on Enterprises' books and records, including all cash receipts and disbursements for all

18

of the Debtors.  None of the Debtors other than Enterprises has maintained bank accounts or books or records.  *Id.*  In addition, in the professional judgment of David Berliner of BDO Seidman LLP, the Debtors' financial advisors, "it is not economically feasible, and likely not possible, to accurately determine the amount of inter-company accounts payable or receivable that may exist as between the various Debtors since 2004."  *Id.* at ¶ 17.

In response to questions at the Confirmation Hearing about how the company treated the various Debtors, Jeremy Miller, the President and CEO of the Debtors, explained that "we treat them [the Debtors] all as one company."  Tr. Confirmation Hearing of Sept. 27, 2007, page 63:24.  Mr. Miller explained further, in response to the follow-up question, "why is that?", as follows:  "Because we are one company."  Tr. Confirmation Hearing of Sept. 27, 2007, page 64:1.  Moreover, as established in the *Declaration of Jeremy Miller in Support of the Fourth Amended Plan of Reorganization of the Source Debtors* [Docket No. 380]  (*see* ¶¶ 29-32), the various names of the Debtors were used interchangeably by the Debtors and creditors alike.  In addition, most, if not all, creditors regarded the Debtors as a single economic entity.  *See In re The Leslie Fay Cos.*, 207 B.R. 764, 779-80 (Bankr. S.D.N.Y. 1997) (approving substantive consolidation where creditors dealt with debtors as a single unit and the affairs of the debtors were entangled).

The fact that all of the Debtors were operated as a single company was also confirmed in the following exchange of questions and answers between Charles Simpson, one of Windels Marx's lead attorneys on this case, and Jeffrey Scott, the Chairman of the board of directors of Enterprises and Entertainment:

> Jeffrey Scott:  The Source was run as one.

* * *

> Charles Simpson:  You have run it as one, correct?

> Jeffrey Scott:  The combination of the management of The Source has generally run it as one.

19

Charles Simpson:  That you oversee, correct?

Jeffrey Scott:  Yes.

Tr. Confirmation Hearing of Sept. 28, 2007, page 18:14.  This fact was also admitted by Mr. Simpson in his closing remarks at the end of the Confirmation Hearing, wherein he stated, among other things, that "it is they that ran [the Debtors] as one entity."  Tr. Confirmation Hearing of Sept. 28, 2007, page 127:9.

   Accordingly, substantive consolidation of the Debtors was proper, appropriate and necessary under the facts and circumstances of the Debtors' cases and there is no evidence to the contrary.  Thus, no reversible error resulted from the Plan's substantive consolidation of the various Debtors.

  **3.**  **The Bankruptcy Court Did Not Err In Including**
     **The Affiliated Debtors in the Debtors' Cases**

   The Bankruptcy Court did not err in authorizing the inclusion of the Affiliated Debtors in the Debtors' cases because the uncontroverted evidence submitted and adduced in connection with the Confirmation Hearing established that (i) no objections were filed to the inclusion of the Affiliated Debtors as "Debtors" for all purposes in the Debtors' cases, (ii) no objections were filed to the Debtors' Joint Administration Motion, (iii) no appeal was filed with respect to the Bankruptcy Court's Order approving the Joint Administration Motion, (iv) no objections were filed to the Debtors' Application of Orders Motion, (v) no appeal was filed with respect to the Bankruptcy Court's Order approving the Application of Orders Motion, (vi) no objections were filed with respect to the Debtors' Consolidated Schedules, which provided comprehensive financial disclosure for all of the Debtors on a consolidated basis and was filed in their jointly administered Chapter 11 cases, (vii) no objections were filed to any of the Monthly Operating Statements, which provided comprehensive financial disclosure of the results of the Debtors' business operations on a monthly basis for all of the Debtors on a consolidated basis and which were filed in their jointly administered Chapter 11 cases, and (viii) the overwhelming

4278270

majority of the Affiliated Debtors did not have unique employer or taxpayer identification numbers.

As explained in the filings made by the Debtors in connection with the commencement of the voluntary cases for the Debtors other than Enterprises, although the Debtors are different entities in name, they have been operated as a single entity (*see* discussion of substantive consolidation, above).  The fact is there were only three unique taxpayer or employer identification numbers between the 19 Debtors.[5]  In a telling admission, Mr. Charles Simpson stated on the record of the meeting of creditors held pursuant to Section 341 of the Bankruptcy Code that most, if not all, of the Affiliated Debtors were merely "minute book entries on a shelf," which is a statement from which Mr. Simpson did not distance himself at the Confirmation Hearing, when he explained as follows:  "And I agree with the statement that I made at the [341] hearing, that most of these entities, most of them, not all of them, most of them appear to have their minute books, you take it down, you do a deal and you put the minute book back up."  Tr. Confirmation Hearing of Sept. 28, 2007, page 127:21.

Windels Marx's Mr. Simpson went on to admit at the Confirmation Hearing that not only was it historically accurate to say that the Debtors had been operated as a single entity but that as a matter of "going forward," it is "probably correct" that the various Debtors should be substantively consolidated and continue to be operated as a single entity.  Tr. Confirmation Hearing of Sept. 28, 2007, page 128:9.  Mr. Simpson's complaint then, at the Confirmation Hearing, was not that the Debtors would be operated as a single entity going forward, but that he did not like the allocation of the ownership of the Reorganized Debtor.  *Id.*

---

[5] The "Debtors," collectively, are the following entities:  (1) Source Enterprises, Inc., a Delaware corporation ("*Enterprises*"), (2) Source Entertainment, Inc., a Delaware corporation ("*Entertainment*"), (3) Source Magazine, LLC, a New York company ("*Magazine*") and each of the following entities and pseudonyms by which any or all of Enterprises, Entertainment and/or Magazine have been known, including (4) Source Entertainment, LLC, a California company, (5) Source Holdings LLC, a Delaware company, (6) Source Merchandising LLC, a New York company, (7) The Source.com, LLC, a New York company, (8) Source Sound Lab, LLC, a Delaware company, (9) Source Music, LLC, a New York company, (10) Source Broadcast Media, LLC, a New York company, (11) The Source, (12) Source Publications, Inc., (13) Source Magazine, (14) The Source Magazine, (15) The Source Awards, (16) Hip-Hop Hits, (17) Source Sports, (18) Unsigned Hype LLC, and (19) Source Media and Merchandising, Inc.

Moreover, in appropriate situations, as in the instant case, debtors may be substantively consolidated even with non-debtors under a Chapter 11 plan. *See generally Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964) (estate of corporate debtor consolidated with 13 affiliated non-debtor corporations); *and In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) (Section 1123(a) of the Bankruptcy Code "unequivocally" permits the substantive consolidation of a debtor with a non-debtor entity "without regard to otherwise applicable nonbankruptcy law, including the corporation law of the State of Delaware or any other state corporation laws having bearing on the debtors") (citations omitted).

Thus, the inclusion of the Affiliated Debtors with the Debtors in their cases does not constitute reversible error.

### 4.   The Bankruptcy Court Did Not Err In Confirming the Plan Even if Certain Debtors Had Not Complied With Their By-Laws' Procedural Requirements

The Bankruptcy Court did not err in approving the Plan that provides for the inclusion among the Debtors of distinct legal entities whose governing bodies are assumed, for purposes of argument, to have not authorized their bankruptcy filings in accordance with their respective by-laws, because the uncontroverted evidence submitted and adduced at or in connection with the Confirmation Hearing established that (i) no objections were filed to the commencement of the Debtors' Chapter 11 cases, (ii) no director or equity holder of any of the Debtors has appealed the Confirmation Order, (iii) no objections were filed to the Debtors' Joint Administration Motion, (iv) no appeal was filed with respect to the order approving the Joint Administration Motion, (v) no objections were filed to the Debtors' Application of Orders Motion, (vi) no appeal was filed with respect to the order approving the Application of Orders Motion, (vii) no objections were filed with respect to the Debtors' Consolidated Schedules, which provided comprehensive financial disclosure for all of the Debtors on a consolidated basis and was filed in their jointly administered Chapter 11 cases, (viii) no objections were filed to any of the Monthly Operating Statements, which provided comprehensive financial disclosure of the

4278270

results of the Debtors' business operations on a monthly basis for all of the Debtors on a consolidated basis and which were filed in their jointly administered Chapter 11 cases, and (ix) the overwhelming majority of the Affiliated Debtors did not have unique employer or taxpayer identification numbers.

Even if one or more of the particular Debtors had not complied with its own by-laws, such technical defect would not divest the Bankruptcy Court of jurisdiction or render improper such Debtor's participation in the Debtors' jointly administered Chapter 11 cases and Plan.  *See In re Adorn Glass & Venetian Blind Corp.*, No. 05 Civ. 1890, 2005 WL 3481325 at *5 (S.D.N.Y. Dec. 16, 2005) (denying leave to appeal denial of a motion to dismiss the debtor's case for failure to comply with corporate formalities where the corporation is closely held "and therefore does not hold itself or its shareholders/directors to the rigors imposed by corporate formalities with respect to any issue . . . ."); *In re American Globus Corp.*, 195 B.R. 263, 266 (Bankr. S.D.N.Y. 1996) (case would not be dismissed despite the fact that case was filed without requisite corporate authority).  The foregoing authority is applicable to the instant case because the Debtors were closely held companies (Mr. Mays was their sole common stockholder), there was no evidence submitted at the Confirmation Hearing that they followed corporate formalities and the fact the Debtors were operated as a single entity, and failed to maintain financial records for any of the Debtors other than Enterprises, suggests they were not constrained by the rigors imposed by corporate formalities.

Thus, any failure of any of the Debtors to comply with requirements of their by-laws in obtaining authorization to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code would not render improper such Debtors' participation as Debtors under the Plan or constitute reversible error by the Bankruptcy Court in approving the Confirmation Order.

**5.    The Bankruptcy Court Did Not Err In Confirming the Plan that Placed
        General Unsecured Creditors of Different Debtors in the Same Class**

The Bankruptcy Court did not err in confirming the Plan that placed general

unsecured creditors of different Debtors in the same class, resulting in the common classification

of claims, because the uncontroverted evidence submitted and adduced at or in connection with

the Confirmation Hearing established (i) that creditors dealt with the Debtors as a single

economic unit and did not rely on their separate identity in extending credit and (ii) the economic

reality was that the Debtors' books and records were incapable of being untangled from one

another, including because no one maintained any separate financial records for any of the

Debtors other than Enterprises for a period of more than two years prior to their bankruptcy

filing or thereafter.

It is clear that a plan proponent has significant flexibility in classifying claims and

interests under Section 1122 of the Bankruptcy Code as long as a rational basis exists for the

classification, all claims or interests within a particular class are substantially similar, and the

proponent is not seeking to gerrymander the vote on the Chapter 11 plan.  *See In re Drexel

Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).  In the instant case,

the Plan's classification of claims and equity interests was proper because, as the Bankruptcy

Court found, (i) the classification together of unsecured claims against the different Debtors had

a rational basis because the Debtors were operated and known as a single economic entity, (ii)

the classification was not for the purpose of creating a consenting impaired class under the Plan

and (iii) the classification does not unfairly discriminate between or among holders of claims or

equity interests.  Moreover, the classification scheme of the Plan is both reasonable and

necessary to the effective reorganization of the Debtors under the facts and circumstances of

these cases, which indicate that the Debtors are properly substantively consolidated pursuant to

the Plan.

Accordingly, the Plan's classification scheme does not violate the Bankruptcy Code and the Bankruptcy Court's approval of same was not reversible error.

**6.    The Existence of the Third-Party Agreement Did Not Violate Either Section 1123 or 1127 of the Bankruptcy Code Because It Did Not Change the Treatment of Any Claims or Modify the Plan**

The Bankruptcy Court did not err in confirming the Plan notwithstanding the Third-Party Agreement between two non-debtor entities, entered into and disclosed to the Bankruptcy Court and all parties-in-interest before the Confirmation Hearing, because the uncontroverted evidence submitted and adduced at or in connection with the Confirmation Hearing established that (i) the Third-Party Agreement did not involve property of the Debtors' estates, (ii) the Plan Funder had a valid business reason to enter into the Third-Party Agreement with the Third-Party Investor but not other third-parties, including creditors in the Debtors' cases, (iii) the Third-Party Agreement contained no provision concerning the treatment of The McMillan Firm's claim in the Debtors' cases or under their Plan, (iv) the treatment of The McMillan Firm's claim under the Plan did not change as a result of the Third-Party Agreement or otherwise, and (v) The McMillan Firm's claim was classified and treated under Plan in exactly the same way as all other general unsecured claims.

In arguing otherwise, Windels Marx misapprehends the Third-Party Agreement. In fact, the record is clear that the Debtors are not parties to the Third-Party Agreement and did not participate in any way in negotiating the agreement. The Third-Party Agreement does not affect (i) The McMillan Firm's claim against the Debtors' estates, which claim is treated under the Plan exactly the same as all other general unsecured claims, (ii) any claims the Debtors may have had against The McMillan Firm or its principals were assigned to the Creditors' Trust for the benefit of holders of allowed general unsecured claims pursuant to the Plan, or (iii) the treatment of any other claims or equity interests under the Plan.

Moreover, the Third-Party Agreement does not provide for the modification or amendment of the Plan, which did not change in any way as a result of the Third-Party Agreement. Indeed, under the Third-Party Agreement, if for any reason the Third-Party Agreement had not been consummated, the failure of the agreement would have had no affect on the Plan.

Specifically, Windels Marx's argument is premised on the erroneous assumption that the Third-Party Agreement affects The McMillan Firm's claim against the Debtors' estates. This is wrong and not supported by any evidence nor could it be. Windels Marx also contends the Plan has been modified by the Third-Party Agreement to provide unequal treatment for The McMillan Firm's claim. Windels Marx's arguments in this regard are incorrect as a matter of fact for the reasons described above.

The participation opportunity that the Plan Funder made available to the Third-Party Investor was premised on the Plan Funder's conclusion that Mr. McMillan's future participation in the Reorganized Debtor was anticipated to enhance the business prospects and operational efficiencies of the Reorganized Debtor both because of the creativity and industry insight that Mr. McMillan has and the business connections that Mr. McMillan would be in a position to bring to the table. *See Declaration of Jeffrey C. Scott in Support of Confirmation of the Fourth Amended Plan of Reorganization of the Source Debtors* [Docket No. 381] (the "*Scott Declaration*") ¶ 16. This opportunity was made available because of the unique value that Mr. McMillan was in a position to provide and had nothing to do with the fact that Mr. McMillan also happened to be a principal of one of the Debtors' creditors. *Id*.[6]

Mr. McMillan's prospective involvement in the Reorganized Debtor after the Effective Date was also anticipated to benefit the interests of secured and unsecured creditors

---

[6] Paragraph 16 of Mr. Scott's declaration provides as follows: "The participation opportunity that BE/GS determined to make available to Northstar is premised on BE/GS's, and my own, conclusion that Mr. McMillan's future participation in the Reorganized Debtor is anticipated to enhance the business prospects and operational efficiencies of the Reorganized Debtor . . . . This opportunity has . . . nothing to do with the fact that [Mr. McMillan]

because both have an "upside" interest in the Reorganized Debtor's income and enterprise value and may benefit from the Reorganized Debtor's revitalization. This opportunity was not made generally available to other third parties, including creditors in the Debtors' cases, because none presented "a likely potential to add value to the Reorganized Debtor in a way that is similar and accretive to the value that Mr. McMillan was anticipated to provide." *See* Scott Declaration ¶ 18.

Accordingly, Sections 1123 and 1127 of the Bankruptcy Code are not implicated, much less violated, by the Third-Party Agreement because such agreement has no impact on the Plan's treatment of any claims or interests and it does not result in a modification of the Plan. *See generally Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197, 204 (3d Cir. 2003) (in context of ascertaining whether a creditor's claim was impaired in a bankruptcy, the court focused on the plan itself rather than matters outside of bankruptcy: "Impairment results from what the *plan* does . . . .") (emphasis in original). The Third-Party Agreement does not cause or specify any change to, or modification of, the terms of the Plan. Thus, Windels Marx's arguments in this regard are unavailing.

[Remainder of Page Intentionally Left Blank.]

---

also happens to be a principal of The McMillan Firm, which is a creditor in the Debtors' cases." Scott Decl. ¶ 16.

4278270

## VII.
## CONCLUSION

For all of the reasons stated above, the Reorganized Debtor respectfully submits that this Court should affirm the Bankruptcy Court's Confirmation Order, and dismiss as moot the appeal which was brought after no stay was requested or obtained, many parties-in-interest substantially changed their circumstances in reliance on the effectiveness of the Plan and the Plan was substantially consummated. If this Court does not affirm on these grounds, the Reorganized Debtor respectfully submits that this Court should affirm the Bankruptcy Court's Confirmation Order on the merits.

Dated:    January 29, 2008
          New York, New York

                        CURTIS, MALLET-PREVOST,
                         COLT & MOSLE LLP

                        By:  /s/ L.P. Harrison 3rd
                            L.P. Harrison 3rd (LH 5540)
                            Turner P. Smith (TS 8052)
                            Jerrold L. Bregman (JB 0784)
                        101 Park Avenue
                        New York, New York  10178-0061
                        Telephone:  (212) 696-6000
                        Facsimile:  (212) 697-1559

                        *Attorneys for the Debtors and Debtors-in-Possession
                          and Source Enterprises, Inc., the Reorganized Debtor*

4278270