**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (CES-2130)
Derek Etheridge (DE-9344)

Appearing *Pro Se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
WINDELS MARX LANE & MITTENDORF, LLP,:          07 Civ. 10375 (SHS)
                                                                 :          USBC 06-B-11707 (AJG)
                        Appellant,          :
                                                                 :
        -against-          :
                                                                 :
SOURCE ENTERPRISES, INC., *et al.*,          :
                                                                 :
                        Appellees.          :
-----------------------------------------------------------------x

---

### APPELLANT'S REPLY BRIEF

---

**WINDELS MARX LANE & MITTENDORF, LLP**

Charles E. Simpson
Derek Etheridge
156 West 56TH Street
New York, New York 10019
(212) 237-1000
Appearing *Pro Se*

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (CES-2130)
Derek Etheridge (DE-9344)

Appearing *Pro Se*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                  :
WINDELS MARX LANE & MITTENDORF, LLP,   :
                                                                  :      07 Civ. 10375(SHS)
                                          Appellant,              :      USBC 06-B-11707(AJG)
                                                                  :
                 against                                          :
                                                                  :
SOURCE ENTERPRISES, INC., *et al.*,                               :
                                                                  :
                                          Appellees.              :
                                                                  :
-----------------------------------------------------------------x

<u>**APPELLANT'S REPLY BRIEF**</u>

Windels Marx Lane & Mittendorf, LLP ("Appellants" or "Windels Marx"), appearing

*pro se*, as and for its Appellant's Reply Brief and in furtherance of Appellant's appeal from the

Order (the "Confirmation Order") of the Honorable Arthur J. Gonzalez, United States

Bankruptcy Judge, confirming the Debtors' Fourth Amended Plan of Reorganization (the

"Plan"), dated August 22, 2007, respectfully represents as follows:

<u>**DISCUSSION**</u>

Source Enterprises, Inc., et al. (the "Debtors"), have, in defense of the arguments

proffered by Windels Marx in support of it's appeal from the Confirmation Order, advanced

several counter-arguments, several of which Windels Marx shall reply to herein. While not

conceding the Debtors' points in the arguments not responded to, the arguments to which

Windels Marx shall reply are: (i) the Bankruptcy Court did not err in ordering substantive

consolidation in the Debtors' cases; (ii) that Windels Marx's appeal should be dismissed because

it has been rendered moot pursuant to the doctrine of equitable mootness, which doctrine renders

an appeal moot when implementation of the relief sought would be inequitable, even when such

relief could be conceivably fashioned; (iii) that as a result of Windels Marx's failure to seek a

stay of the Confirmation Order, numerous parties-in-interest acted in reliance on the

Confirmation Order by participating in the so-called Reliance Actions, which are those actions

taken on and after the Effective Date of the Plan and, according to the Debtors, serve as evidence

of substantial confirmation of the Plan; (iv) that the Plan has been substantially consummated

and that the Confirmation Order has resulted in a comprehensive change in circumstances for the

Debtors and the parties-in-interest who have relied on the Confirmation Order; and (v) that the

requested relief would affect the re-emergence of the Debtors as a revitalized corporate entity

and unravel intricate transactions.  Each argument will be responded to in turn.

**The Bankruptcy Court did not err in ordering**
**<u>substantive consolidation in the Debtors' cases</u>**

Following the chapter 11 filings of Entertainment and Magazine, approximately ten (10)

months after Enterprises was forced into an involuntary chapter 7 and the subsequent joint

administration of those cases with the chapter 11 case of Enterprises, the Debtors for the first

time characterized nineteen (19) of their subsidiaries and affiliates as additional Debtors, even

though none of the said subsidiaries and/or affiliates had filed petitions for relief, schedules,

statements of financial affairs or creditor lists, under any chapter of the Bankruptcy Code.[1]

Therefore, without the filing of these predicates, the Bankruptcy Court never obtained, or

---

[1]  Windels Marx does not dispute the fact that Enterprises, Entertainment and Magazine were properly filed and the Bankruptcy Court properly exercised jurisdiction over these three (3) entities.  Windels Marx does appeal from the order granting substantive consolidation with respect to Entertainment and the 19 "pseudonymous" entities and the Bankruptcy Court's jurisdiction over the 19 "pseudonymous" unfiled entities.

properly exercised, jurisdiction over these 19 entities.  In the Plan, the term "Debtors" is defined

as follows:

> "Debtors" means, collectively, all of the following: (1) Source
> Enterprises, Inc., a Delaware corporation ("Enterprises"), (2)
> Source Entertainment, Inc., a Delaware corporation
> ("Entertainment"), (3) Source Magazine, LLC, a New York
> company ("Magazine") <u>and each of the following entities and
> pseudonyms by which any or all of Enterprises, Entertainment
> and/or Magazine have been known,</u> including (4) Source
> Entertainment, LLC, a California company, (5) Source Holdings,
> LLC, a Delaware company, (6) Source Merchandising, LLC, a
> New York Company, (7) The Source.com, LLC, a New York
> company, (10) Source Broadcast Media, LLC, a New York
> Company, (11) The Source Magazine, (15) The Source Awards,
> (16) Hip Hop Hits, (17) Source Sports, (18) Unsigned Hype LLC,
> and (19) Source Media and Merchandising, Inc."  (Emphasis
> Added.)

Several of the 19 "pseudonymous" entities are legitimate free standing entities that are

registered with the respective Departments of State in which they were initially filed and

incorporated.  Testimony at the confirmation hearing reveals that Source.com, Inc., Source

Holdings, LLC, Source Sound Lab, LLC, Source Broadcast Media, LLC, Source Music, LLC,

and Source Merchandising, LLC, are not in fact pseudonyms for Enterprises, Entertainment

and/or Magazine, but are legitimate, incorporated entities in their own right that have, at one time

or another, conducted business independently of Enterprises, Entertainment and Magazine.  In

fact, while Enterprises and Magazine were involved in the publication of Source Magazine,

Entertainment and the pseudonymous entities were engaged in business unrelated to the

publication of the magazine.  Furthermore, several of these pseudonymous entities are named

defendants in litigation pending in state courts throughout the country, had been incurring legal

fees and expenses and should not have received the benefits of the automatic stay, discharge

injunctions or been subjected to the jurisdiction of the Bankruptcy Court without first filing

petitions for relief under the Bankruptcy Code and providing the notice to creditors and information required by the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. In addition, some of these entities are signatories to contracts that realize income, may ultimately result in the realization of income or render the entity liable for the payment of indebtedness.[2] For example, a number of these entities not then subject to the Bankruptcy Court's jurisdiction, were represented by Windels Marx in litigation in the state courts and for which legal fees are owed and form the basis of Windels Marx' claims. Also, commissions are owed by third parties to these entities over which there are charging and judgment liens.

Notwithstanding the above and the provisions of the Bankruptcy Code, Enterprises, Entertainment, Magazine and each of the non-debtor subsidiaries and affiliates, their assets and creditors are substantively consolidated under the Plan, even though the characterization of these entities as merely pseudonymous outfits is a misrepresentation of their true nature. Irrespective of whether or not these entities have assets or not, lack independent books and records or lack respective bank accounts, they can not be afforded relief under any chapter of the Bankruptcy Code without having appropriately filed a voluntary petition entitling such relief and under no circumstances should Black Enterprises/Greenwich Street Corporate Growth Partners ("BE/GS"), who has controlled these Debtors throughout these proceedings, be permitted to piggyback these pseudonymous entities off of the chapter 11 protection afforded Enterprises, Entertainment and Magazine and reap the benefit of their assets to the detriment of their creditors.

---

[2]  The Disclosure Statement acknowledges that "certain intellectual property, including, without limitation, certain trademarks and copyrights, and certain contracts, are held in the name of Entertainment, and/or Magazine and/or Unsigned Hype, and/or Source Media and Merchandising, LLC…" Disclosure Statement, Page 22. A thorough examination of all trademarks and copyrights held by the Debtors and/or their affiliates and subsidiaries and all contracts to which the Debtors and/or its affiliates and subsidiaries are signatories will doubtlessly reveal that several additional unnamed entities hold, or are signatories to, trademarks, copyrights and contracts.

A number of courts have outlined the principles to be advanced by substantive

consolidation and the harm that is to be avoided.  These factors have been articulated thusly:

> (1) Limiting the cross-creep of liability by respecting entity
> separateness is a fundamental ground rule.  As a result, <u>the
> general expectation of state law and of the Bankruptcy Code,</u>
> and thus of commercial markets, <u>is that courts respect entity
> separateness absent compelling circumstances</u> calling equity
> (and then only possibly substantive consolidation) into play.

> (2) <u>The harms substantive consolidation addresses are nearly
> always those caused by debtors (and entities they control) who
> disregard separateness.</u>  Harms caused by creditors typically
> are remedied by provisions found in the Bankruptcy Code.

> (3) <u>Mere benefit to the administration of the case</u> (for example,
> allowing a court to simplify a case by avoiding other issues or
> to make postpetition accounting more convenient) <u>is hardly a
> harm calling substantive consolidation into play.</u>

> (4) …[B]ecause substantive consolidation is extreme (it may affect
> profoundly creditors' rights and recoveries) and imprecise, <u>this
> rough justice remedy should be rare and, in any event, one of
> the last resort after considering and rejecting other remedies</u>
> (for example, the possibility of more precise remedies
> conferred by the Bankruptcy Code).

> (5) While substantive consolidation may be used defensively to
> remedy the identifiable harms caused by entangled affairs, <u>it
> may not be used offensively (e.g., having a primary purpose to
> disadvantage tactically a group of creditors in the plan process
> or to alter creditor rights).</u>  (Emphasis added.)

*In re Owens Corning*, 419 F.3d 195, 211 (3rd Cir. 2005).  Substantive consolidation in this case

disadvantages creditors totally for the benefit of the Debtors and BE/GS, their controlling

Shareholder, Secured Creditor and Plan Funder.[3]  Furthermore, the Second Circuit has

admonished that substantive consolidation "is no mere instrument of procedural convenience . . .

---

[3] .  There is no equitable basis upon which these cases should have been substantively consolidated.  The testimony
of Jeffrey Scott supports the contention that BE/GS directed the Debtors to move for substantive consolidation
merely because BE/GS perceived the several existing entities as one entity upon its takeover of management in
January, 2006, ignoring the fact that there existed several entities, each conducting business independently of one
another.

but a measure vitally affecting substantive rights" and should be used "sparingly" to avoid "the

dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent

debtor. . . ." *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).  A situation

present in the instant case.  Ultimately, substantive consolidation should be employed only in the

limited circumstance where it ensures "the equitable treatment of *all* creditors." *Id.* (Emphasis

added).

Taking into account the foregoing factors and considerations, proponents of substantive

consolidation have the burden of showing that either (i) prepetition, the debtor disregarded the

separateness of its entities so significantly that its creditors relied on the breakdown of entity

borders and treated them as one legal entity, or (ii) postpetition, the debtors' entities' assets and

liabilities are so scrambled that separating them is "either impossible or so costly as to consume

the assets" and will hurt all creditors.  *Id.* at 518-19.  A *prima facie* case typically exists for the

first rationale when, based on the parties' prepetition dealings, a proponent proves corporate

disregard creating contractual expectations of creditors that they are dealing with debtors as one

indistinguishable entity.  *Owens Corning* citing Mary Elisabeth Kors, *Altered Egos: Deciphering*

*Substantive Consolidation*, 59 U. Pitt. L. Rev. 381, 417-418 (1998) (hereinafter cited as "*Kors*");

Christopher W. Frost, *Organizational Form, Misappropriation Risk and the Substantive*

*Consolidation of Corporate Groups*, 44 Hastings L.J. 449, 457 (1993); *Augie/Restivo*, 860 F.2d

at 518 (noting that creditors must have dealt with the entities as a single economic unit and not

relied on their separate identities in extending credit); *In re 599 Consumer Elecs. Inc.*, 195 B.R.

244, 249 (S.D.N.Y. 1996) (noting that the inquiry centers on "whether *creditors* treated the

debtors as a single entity, not whether the managers of the debtors themselves, or consumers,

viewed the [entities] as one enterprise") (emphasis in original).  Proponents of substantive

consolidation who are creditors must also show that in their prepetition course of dealing, they actually had reasonably relied on debtors' supposed unity. *Kors* at 418-19. Creditor opponents of consolidation can nonetheless defeat a *prima facie* showing regarding the significant extent to which the debtor disregarded separateness if they can prove they are adversely affected and actually relied on the debtor's separate existence. A *prima facie* case under the second rationale requires a showing that the commingling of assets and business functions between debtors has resulted in a hopelessly obscure interrelationship which cannot be untangled. *Augie/Restivo*, 860 F.2d at 519. Commingling "can justify substantive consolidation only where the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors . . . or where no accurate identification and allocation of assets is possible." *Id.* (Internal quotations and citation omitted).

In the instant case, the Debtors proffered not one piece of evidence of the prepetition disregard of the separateness of the Source entities. To the contrary, each entity was formed for a specific purpose and maintained its own creditor body. In addition, many of the creditors that loaned money to three (3) main Debtor entities obtained separate loan guarantees from their affiliates, clearly evidencing the creditors' recognition that the affiliates were separate entities. *See In re 599 Consumer Elecs.*, 195 B.R. at 249 (denying substantive consolidation, following the *Augie/Restivo* court's specific holding that "a bank's insistence on separate loan guarantees by related corporations displays an understanding that the related corporations are separate entities"); *Augie/Retivo*, 860 F.2d at 519. Furthermore, upon the retention of Windels Marx to represent certain Source entities, the board of directors required that Windels Marx execute two (2) separate retainer agreements; one for Entertainment and one for Enterprises. And, the Debtors were filed at different times, separate and apart from each other and the pseudonymous

entities.  Indeed, Windels Marx was adversely affected by its detrimental reliance upon the

separateness of the entities, as Windels Marx continued to represent non-debtors Entertainment

and Magazine prior to the filing of their chapter 11 petitions, as well as several of other the non-

debtor "pseudonymous" entities, only to have the Debtors and BE/GS challenge the propriety of

that representation in an effort to avoid paying Windels Marx's legal fees.

     "Only through a searching review of the record, on a case-by-case basis, can a court

ensure that substantive consolidation effects its sole aim: fairness to all creditors." *FDIC v.*

*Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992); *see also In re 599 Consumer Elecs.*, 195

B.R. at 250 (vacating order of substantive consolidation, in part, due to lower court's

"conclusory" findings regarding commingling of debtor entities' assets).  In the present case, not

only is the record barren of evidence justifying consolidation, but the Bankruptcy Court omitted

any analysis thereof in determining to consolidate, committing an error as a matter of law.

**The Plan has been substantially consummated and the**
**Confirmation Order has resulted in a comprehensive change**
**<u>in circumstances for the Debtors and parties-in-interest</u>**

     The Debtors claim that "myriad parties-in-interest have comprehensively changed their

circumstances as a consequence of, and in reliance on, the finality of the Confirmation Order,

and...the Debtors' Plan has been substantially consummated."  The Debtors' allege that the

Reliance Actions referred to in the Appellee's Brief illustrate the great extent to which parties-in-

interest have comprehensively changed their circumstances in reliance on the effectiveness of the

Plan and the finality of the Confirmation Order.  The Debtors further contend that these Reliance

Actions provide evidence of the substantial consummation of the Plan.

     The Reliance Actions referred to by the Debtors in its Appellee's Brief only relate to

Enterprises as they relate to the publication of Source Magazine and are mischaracterized as

being for the benefit of parties-in-interest when in fact they are solely for the benefit of one party-in-interest, BE/GS, the controlling interest on the Debtors' board of directors, the largest unsecured creditor, the Debtors' DIP lender and the Plan Funder. Of the ten (10) Reliance Actions alleged to have been taken by the Debtors that purportedly serve as evidence of the consummation of their Plan, only two (2) of these Actions even relate to or benefit a party-in-interest other than BE/GS.

The fact of the matter is that under the Plan the unsecured creditors, numbering in the thousands, receive absolutely nothing except the promise of a percentage of the funds, if any, received from the causes of action pursued by the Creditors Trust. Two of these so-called Reliance Actions refer to the transfer of $400,000 to a Creditors' Trust that is purported under the Plan to be used to pursue causes of action on behalf of the estate. Interestingly, the Debtors fail to list as a Reliance Action their grant of a third party release to BE/GS and the members thereof, entities against whom the Creditors Trust would have been most effective in pursuing causes of action against. Notwithstanding the Reliance Action referring to payment of administrative claims, a baseless reference as BE/GS, as the Plan Funder, is statutorily required to pay administrative fees.

The remaining Reliance Actions are solely for the benefit of BE/GS. These Reliance Actions consist of : (i) extinguishing and canceling all previously existing equity interests in the Debtors so that 85% of the equity interest could be redistributed to BE/GS, with 15% going to Textron Financial Corp. ("Textron"), the Debtors' senior secured lender; (ii) naming a new board of directors, which is essentially the old board of directors minus two (2) non-BE/GS members, and officers hand-selected by BE/GS; (iii) and entering into a deal with Textron whereby Textron accepted substantially less than the amount of its claim in settlement thereof, plus 15%

of the Debtors equity, as previously stated. None of these Reliance Actions are affected by the relief sought on this appeal as they do not relate to the "pseudonymous" entities.

Based on the aforementioned, the Debtors or rather BE/GS' contention that it would be inequitable to grant the Appellant's the relief sought, as such relief will unravel intricate transactions and undermine the authorization for every transaction that has taken place, thereby creating an unmanageable, uncontrollable situation for the Bankruptcy Court is nothing more than a smoke screen. The reality is that besides the Bankruptcy Court-appointed professionals in this case and the administrative expenses paid to them by BE/GS under the Interim Compensation Order issued in the chapter 11 proceedings as well as under the Plan, there are no intricate transactions to unravel in this case. For all intents and purposes, the pseudonymous entities are not involved and the only parties-in-interest affected by the transactions contemplated in the Confirmation Order are BE/GS, Textron, the trustee in charge of administering the Creditors' Trust who, by the way, is the former head of the Committee of Unsecured Creditors and will be compensated from the funds of the litigation trust, and, to the least extent, the Debtors, as the Debtors, whose board of directors was controlled by BE/GS, had neither an identity nor means of sustenance separate and apart from BE/GS. The 19 pseudonymous entities are not affected by Reliance Actions.

**The Plan has been substantially consummated and the Confirmation Order resulted in a comprehensive change in circumstances for the Debtors and parties-in-interest**

The Debtors' contention that the Plan is substantially consummated is inconsequential in light of the fact that the transactions contemplated under the Plan primarily involve insiders of the Debtor. The Debtors' further contention that the Plan being substantially consummated has

resulted in a comprehensive change in circumstance for the Debtors and the parties-in-interest is patently false.

As previously discussed, the only party-in-interest affected by the Confirmation Order is BE/GS. There would be absolutely no effect on the Debtors' ability to conduct business, as the enterprise would continue to be funded, managed and controlled by BE/GS. Likewise, the deal that paid Textron $200,000 under the Plan would remain intact as it was, for all intents and purposes, a deal solely between BE/GS and Textron, as all of the transactions contemplated under the Plan were funded by BE/GS as the Plan Funder and not the Debtors.

Deconstruction of the Creditors' Trust would be inconsequential to the unsecured creditors of the estate since, as it stands, the unsecured creditors have yet to receive any money from the causes of action alleged to be pursued on behalf of the estate by the Creditors' Trust. To date, the Creditors' Trust has resulted in nothing more than the accumulation of fees for the trustee of the Creditors' Trust.

As far as the Debtors' are concerned, from a business standpoint they are in no different position than they were a year ago. The magazine continues to get published on a monthly basis and they are still vying to recapture the market share they lost under their former management.

**The requested relief would affect the re-emergence of the debtor as a revitalized corporate entity and unravel intricate transactions**

As previously mentioned in pleadings filed by Windels Marx that have been designated as part of the record, BE/GS sought to acquire the Debtors for itself since its earliest involvement with the company. There is little about the Reliance Actions that revitalizes the Debtors as a corporate entity. On the contrary, the Reliance Actions serve the ends of BE/GS by eliminating the former members of senior management from the board of directors while simultaneously

extinguishing their equity interests in the Debtors, using the freed up equity as leverage to settle Textron's claim for a fraction of what it was worth, acquire 85% of the equity of the Debtors for itself, handpick the officers of Debtors, and continue with the Debtors' business, having achieved their goal of acquiring the Debtors without having to pay anything to creditors of the Debtors or their non-debtor subsidiaries and affiliates.

## CONCLUSION

Windels Marx Lane & Mittendorf, LLP respectfully requests that this case be remanded for the reasons set forth herein, and grant such other and further relief as this Court deems proper.

Dated: New York, New York

February 22, 2008

                              WINDELS MARX LANE & MITTENDORF, LLP

                              By: _____
                                    Charles E. Simpson (CES-2130)
                                    A Member of the Firm

                              156 West 56th Street
                              New York, New York 10019
                              (212) 237-1000

                              Appearing *Pro Se*

{10437806:2}                              -13-