UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
IN RE: SOURCE ENTERPRISES, INC.                 :
                                                :
WINDELS MARX LANE & MITTENDORF, LLP    :              07 Civ. 10375 (SHS)
                                                :
                        Appellant,              :      (USBC-SDNY, 06-B-11707 (AJG))
                                                :
            v.                                  :
                                                :              OPINION & ORDER
SOURCE ENTERPRISES, INC., et al.,               :
                                                :
                        Appellees.              :
                                                :
----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        Windels Marx Lane & Mittendorf, LLP ("Windels") appeals pro se from an order of the

United States Bankruptcy Court for the Southern District of New York confirming the Source

Enterprises, Inc. debtors' Fourth Amended Plan of Reorganization dated August 22, 2007 (the

"Plan"). In an Order dated October 1, 2007, Bankruptcy Judge Arthur J. Gonzalez confirmed the

Plan, and overruled objections, including those filed by Windels.  In re Source Enters., Inc., No.

06-11707 (AJG), 2007 WL 2903954, at *9 (Bankr. S.D.N.Y. Oct. 1, 2007).  Windels here argues

that the Plan should not have been confirmed because (1) the debtors should not have been

substantively consolidated with each other; (2) the Plan ignores the fact that corporate

governance requirements such as board approval of filing a bankruptcy petition were not met; (3)

the Plan violated section 1122(a) of the Bankruptcy Code by placing creditors with substantially

dissimilar claims in the same class; (4) the Plan violated section 1123(a)(4) of the Bankruptcy

Code by treating creditors in the same class differently; and (5) the Plan was modified in a way

that led to disparate treatment of one creditor in violation of sections 1127(a), (c), (d), (f)(1) and

(f)(2) of the Bankruptcy Code.  Windels' objections lack merit, and, furthermore, its claims are

barred as equitably moot.  This Court therefore affirms the Bankruptcy Court's confirmation of the Plan.

## I.     BACKGROUND

The debtors published <u>The Source</u>, a monthly magazine, and <u>The Source Latino</u>.  The debtors also engaged in related businesses, such as the licensing of Enterprises' trademarks and trade names for use in connection with programming, Source-branded CDs and DVDs, and the sale of products including ring tones and "wallpaper" for mobile telephones and computers.

The debtors include the following entities: (1) Source Enterprises, Inc., a Delaware corporation ("Enterprises"); (2) Source Entertainment, Inc., a Delaware corporation ("Entertainment"); (3) Source Magazine, LLC, a New York company ("Magazine") (collectively, "primary debtors"); and each of the following entities and pseudonyms by which any or all of Enterprises, Entertainment and/or Magazine have been known, including (4) Source Entertainment, LLC, a California company; (5) Source Holdings LLC, a Delaware company; (6) Source Merchandising LLC, a New York company; (7) The Source.com, LLC, a New York company; (8) Source Sound Lab, LLC, a Delaware company; (9) Source Music, LLC, a New York company; (10) Source Broadcast Media, LLC, a New York company; (11) The Source; (12) Source Publications, Inc.; (13) Source Magazine; (14) The Source Magazine; (15) The Source Awards; (16) Hip-Hop Hits; (17) Source Sports; (18) Unsigned Hype LLC; and (19) Source Media and Merchandising, Inc. (collectively, "subsidiary debtors").  <u>See</u> <u>Source</u>, 2007 WL 2903954, at *1.

Enterprises' bankruptcy case commenced in July 2006, when three of its creditors filed an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code.  <u>Id.</u>  The Bankruptcy Court converted the Chapter 7 case to a Chapter 11 case in September 2006, and the

debtors other than Enterprises filed voluntary petitions for relief under Chapter 11 in April 2007. Id. The Court ordered that debtors' cases be administered jointly and that all of the substantive orders in Enterprises' case would apply to Entertainment and Magazine as well. Id.

A hearing was held in the debtors' bankruptcy cases on August 21, 2007, and the next day, the debtors filed the Plan and a Disclosure Statement with Respect to the Fourth Amended Plan of Reorganization of the Source Debtors ("Disclosure Statement"). Id. As part of the Plan, Black Enterprise/Greenwich Street Corporate Growth Partners, L.P. ("BE/GS"), which had been running debtors since at least 2006, would receive 85 percent of the reorganized debtor[1] and releases from liability. Id. at *17, *19. On August 23, 2007, the Bankruptcy Court entered an order approving the Disclosure Statement. Id. at *2.

Before a confirmation hearing was held, Northstar Marketing Group, Inc. ("Northstar") and BE/GS disclosed the existence of an agreement concerning a contemplated transaction pursuant to which Northstar would have the right, after a certain date, to purchase from BE/GS a portion of the equity of the reorganized debtor that BE/GS was to receive under the Plan. Id. At the same time, a principal of Northstar, L. Londell McMillan, withdrew an objection to an earlier version of the Plan filed by his law firm, L. Londell McMillan P.C. (the "McMillan Firm").

Two objections were filed to the final version of the Plan: one by Windels and one by David Mays, the founder and former President and CEO of the debtors. Id. at *3. Windels is a law firm that represented various Source entities pre- and post-petition. Id. at *17. In its objections, it stated that it had been retained by Enterprises, Entertainment and BE/GS on January 24, 2006, as counsel to the primary and subsidiary debtors, and was owed $104,636.09 for services rendered. (Objection of Windels Marx Lane & Mittendorf, LLP with Respect to the

---

[1] The reorganized debtor is defined in the Plan as "the entity, to be known as 'Source Enterprises, Inc.,' into which all of the Debtors shall be deemed to be merged, and to whom all of their assets . . . shall be deemed to belong, as of the Effective Date, and which shall emerge as the reorganized debtor pursuant to this Plan." (Plan at 9.)

Proposed Fourth Amended Plan of Reorganization of the Source Debtors ("Windels Obj.") at ¶ 1-2.)  Windels withdrew as Enterprises' Chapter 11 counsel in April 2007.  (Id. ¶ 3.)  Windels objected to the Plan on several grounds, but, at bottom, it was objecting to being classified as a pre-petition unsecured creditor rather than as an administrative creditor as a result of its prior role as debtors' bankruptcy counsel.  Source, 2007 WL 2903954, at *17.  It objected to the Plan in the first instance because it argued that BE/GS was effectively the same entity as the debtors and was using its complete control of the debtors to direct them to submit a Plan that wholly insulated BE/GS from the debtors' debts.  (Windels Obj. ¶¶ 11, 14.)  Windels also objected to the subsidiary debtors being granted relief under the Bankruptcy Code, because those entities were legitimate companies in their own right and had not filed voluntary petitions for relief or adhered to other corporate governance requirements.  (Id. ¶¶ 17-21.)  Windels asserted that the Plan violated section 1122(a) and 1123(a)(4) of the Bankruptcy Code by lumping together all holders of unsecured claims (id. ¶ 22), and by treating those claimants differently (id. ¶¶ 23-24).  Finally, Windels objected because the plan was modified to satisfy the objections of another creditor, the McMillan Firm, which was treated differently from—and more favorably than—all the other general unsecured creditors.  (Id. ¶¶ 26-27.)

    After a two-day confirmation hearing, and the Bankruptcy Court issued its findings of fact and conclusions of law on October 1, 2007.  Source, 2007 WL 2903954.  Bankruptcy Judge Gonzalez confirmed the Plan and overruled the objections.  Id. at *9.  In disposing of the objections, the Bankruptcy Court first approved the substantive consolidation of the debtors "in recognition of the economic reality that the Debtors' books and records are incapable of being 'untangled' from one another, and creditors, as well as the debtors themselves, have dealt as though the debtors are a single entity."  Id. at *5, *10.  The Bankruptcy Court also found that the

Plan complied with "all applicable provisions of the Bankruptcy Code," including sections 1122 and 1123 because the classes designated by the Plan contained claims or equity interests that were "substantially similar" to each other, and provided for the same treatment of the claims and interests within each class. Id. at *5.

In response to Windels' objections, Judge Gonzalez noted that a secured creditor, Textron Financial Corporation, had a claim "far in excess" of the entire value of the debtors' assets, and yet it had agreed to the terms of the Plan and was waiving an "overwhelming deficiency claim." Id. at *18. In light of the enormous concessions made by Textron, Windels' assertion that unsecured creditors could have obtained more value "is simply not credible," Judge Gonzalez concluded. Id. Furthermore, the Unsecured Creditors' Committee had agreed to the terms of the plan, and "[e]very conceivable alternative to the Plan was investigated by the Committee." Id. The Court found that BE/GS was not receiving any more than it had invested post-petition, and it was also not credible that BE/GS had manipulated the process in some way. Id. at *19. The Court noted that substantive consolidation was proper because despite the fact that the different debtor entities had signed separate retainer agreements with Windels, Windels was only paid for its work by Enterprises. Id. Based on the testimony of Jeremy Miller, President and CEO of debtors, and David Berliner, a partner of BDO Seidman, LLP ("BDO"), an accounting and financial advisory firm that provided services to debtors throughout the Chapter 11 process, the Court found "substantial identity between the entities to be consolidated": the debtors had the same officers, directors, and shareholders, conducted the same business operations under similar names, corporate formalities were not observed for inter-company dealings, and accounts receivable were billed from Enterprises alone. Id. at *20. The agreement between Northstar with BE/GS was prospective and not a modification of the Plan. Id. And finally, the Bankruptcy

Court noted that the two board members who did not approve the filing of the bankruptcy petitions were given adequate notice of the board meetings, and the board's actions were therefore proper.  Id.

This appeal followed.

## II.    STANDARD OF REVIEW

Because the order of the Bankruptcy Court below is a final one, this Court has jurisdiction on appeal pursuant to 28 U.S.C. § 158(a).  The bankruptcy court's findings of fact must be accepted by this Court unless they are clearly erroneous, Fed. R. Bankr. P. 8013, whereas the bankruptcy court's findings of law are reviewed de novo.  Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines), 374 B.R. 516, 522 (S.D.N.Y. 2007).

## III.    DISCUSSION

Windels objects to the Plan on essentially the same grounds here as it did before the Bankruptcy Court.  Windels asserts that the Plan should not have been confirmed because (1) the debtors should not have been substantively consolidated; (2) the Plan ignored the fact that corporate governance requirements—such as board approval of filing for bankruptcy—were not met for some of the primary and all of the subsidiary debtors; (3) in violation of section 1122(a) of the Bankruptcy Code, creditors with substantially dissimilar claims were placed in the same class; (4) in violation of section 1123(a)(4) of the Bankruptcy Code, creditors in the same class were treated differently; and (5) the modification of the Plan that gave Northstar—and its principal, McMillan—opportunities with respect to the reorganized debtor that were not offered to any other creditors, violated sections 1127(a), (c), (d), (f)(1) and (f)(2) of the Bankruptcy Code by treating the McMillan Firm differently than all other general unsecured creditors.  Debtors respond chiefly that Windels' appeal is equitably moot because there has been a "comprehensive change in

circumstances" and the plan of reorganization has been "substantially consummated" (Appellees'

Brief dated Jan. 29, 2008 ("Opp. Br.") at 13 (quoting <u>Delta</u>, 374 B.R. at 522), and, if the appeal is

not equitably moot, it fails on the merits.

    A. <u>Equitable Mootness</u>

    Before considering the merits, the Court must address a threshold matter: whether this

appeal is barred under the "equitable mootness" doctrine as set forth in <u>Frito-Lay, Inc. v. LTV</u>

<u>Steel Co. (In re Chateaugay Corp.)</u> (<u>Chateaugay II</u>), 10 F.3d 944 (2d Cir. 1993). The mootness

doctrine arises from the "fundamental jurisdictional tenet that Federal courts are empowered only

to hear live cases and controversies." <u>TWA, Inc. v. Texaco, Inc. (In re Texaco, Inc.)</u>, 92 B.R. 38,

45-46 (Bankr. S.D.N.Y. 1988). In bankruptcy cases, the doctrine is a prudential one, and the

Second Circuit has applied it to hold that "[a]n appeal should . . . be dismissed as moot when,

even though effective relief could conceivably be fashioned, implementation of that relief would

be inequitable." <u>Deutsche Bank AG v. Metromedia Fiber Network (In re Metromedia Fiber</u>

<u>Network, Inc.)</u>, 416 F.3d 136, 143 (2d Cir. 2005) (quoting <u>Official Comm. of Unsecured</u>

<u>Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel</u>

<u>Co. (In re Chateaugay Corp.)</u> (<u>Chateaugay I</u>), 988 F.2d 322, 325 (2d Cir. 1993)). The doctrine is

therefore "invoked to avoid disturbing a reorganization plan once implemented," <u>Metromedia</u>, 416

F.3d at 144, and can be applied in two situations: "when an unstayed order has resulted in a

comprehensive change in circumstances, and when a reorganization is substantially

consummated," <u>Delta</u>, 374 B.R. at 522 (internal citations and quotation marks omitted).

    As defined by the Bankruptcy Code, "substantial consummation" means the "transfer of all

or substantially all of the property proposed by the plan to be transferred, . . . assumption by the

debtor or by the successor to the debtor under the plan of the business or of the management of

all or substantially all of the property dealt with by the plan; and . . . commencement of distribution under the plan." 11 U.S.C. § 1101(2). "[W]hen a reorganization has been substantially consummated . . . , there is a strong presumption that an appeal of an unstayed order is moot." Delta, 374 B.R. at 522 (internal quotations and citations omitted).   This presumption can only be overcome if five circumstances are present:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

Chateaugay II, 10 F.3d at 952-53 (internal quotation marks, citations and alterations omitted).[2]

　　　　Debtors argue both that "substantial consummation" of the reorganization has occurred and that there has been a comprehensive change in circumstances.  To those ends, they cite a lengthy list of "Reliance Actions" that have taken place since October 31, 2007, the Plan's effective date, including canceling equity interests in the debtors and obligations to the secured lender; transferring approximately $1.4 million to creditors; issuing stock certificates to the Plan Funder and Textron; executing the Creditors' Trust Agreement; filing an amended certificate of incorporation and by-laws; naming new officers and directors; entering into a Note with Textron; and commencing business operations as the reorganized debtor, including publishing a monthly

---

[2] These Chateaugay factors are also instructive as to whether there has been a "comprehensive change in circumstances," the other situation to which the equitable mootness doctrine applies.  See Delta, 374 B.R. at 524. Furthermore, "when bankruptcy appellants have failed and neglected diligently to pursue the available remedies to obtain a stay of the Confirmation Order," they have "thereby . . . permitted . . . a comprehensive change of circumstances to occur," and "it [would be] inequitable to hear the merits of their case."  Texaco, 92 B.R. at 45 (internal quotations and citation omitted).  Because the Court finds that the Plan has been substantially consummated, it need not address whether there has also been a change in circumstances.

magazine and entering into agreements with vendors, suppliers and employees.  (Opp. Br. at 10.)

Debtors argue that in light of the fact that the transfers have been made and distributions to

Textron and other creditors have commenced, a presumption of mootness should apply, because

the relief sought by Windels would affect "the re-emergence of the debtor as a revitalized

corporate entity" and "unravel intricate transactions." (Opp. Br. at 13 (quoting <u>Chateaugay II</u>, 10

F.3d at 953).)  Windels does not dispute that the Plan has been substantially consummated;

instead it contends that that fact is irrelevant, as all but two of the Reliance Actions benefit only

BE/GS insiders of the debtor, according to Windels and the other two Reliance Actions at issue

would not be affected by the relief sought on appeal.  The agreement that resulted in Textron

being paid $200,000, for example, would remain intact because it was a transaction between

BE/GS and Textron, Windels asserts.

     The Reliance Actions lead the Court to conclude that there has been a "transfer of all or

substantially all of the property proposed by the plan to be transferred, . . . [an] assumption by

the debtor or by the successor to the debtor under the plan of the business or of the management

of all or substantially all of the property dealt with by the plan; [or a] commencement of

distribution under the plan," and thus the Plan has been substantially consummated.  11 U.S.C. §

1101(2); <u>see</u> <u>Metromedia</u>, 416 F.3d at 144.  As noted, Windels has not argued otherwise.

     Nevertheless, although substantial consummation is a "momentous event," it "does not

necessarily make it impossible or inequitable for a court to grant effective relief." <u>Loral</u>

<u>Stockholders Protective Comm. v. Loral Space & Comm'cns Ltd. (In re Loral Space & Comm'cns</u>

<u>Ltd.)</u>, 342 B.R. 132, 137 (Bankr. S.D.N.Y. 2006) (quoting <u>Chateaugay II</u>, 10 F.3d at 952).  The

court therefore turns to the <u>Chateaugay</u> factors to determine whether Windels has overcome the

presumption of mootness inherent in a finding of substantial consummation.  Id.; see also

Chateaugay II, 10 F.3d at 952-53; Delta, 374 B.R. at 523.

The first Chateaugay factor asks whether "the court can still order some effective relief."

Chateaugay II, 10 F.3d at 952-53.  Windels appears to ask for the Plan to be vacated and for this

Court to determine that the subsidiary debtors should not have been substantively consolidated

with the primary debtors and that the Plan violates the Bankruptcy Code because of the way

Windels is treated under the Plan compared to other creditors.  Windels argues that effective

relief could be granted because the subsidiary debtors are irrelevant to the Plan and removing

them from the substantive consolidation would not impact the Reliance Actions.  The

Bankruptcy Court addressed Windels' arguments that the subsidiary debtors were "legitimate

incorporated entities in their own right," and thus should have been obligated to Windels for their

legal fees, instead of consolidated with the primary debtors, which had the effect of rendering

Windels an unsecured creditor with subordinated debt.  First, the Bankruptcy Court noted that

Windels had conceded at a hearing that substantive consolidation might have been necessary.

Source, 2007 WL 2903954, at *17.  Second, the Court noted that Textron had a secured claim for

more than all of the debtors' total assets, and the fact that Textron was agreeing to the Plan was of

the utmost importance.  Id. at *18.  In fact, the Bankruptcy Court stated that "no value [was]

available for [any creditors] unless Textron [was] willing to substantially compromise its lien."

Id. at *19.

Based on the evidence before the Court, it is not clear how important the substantive

consolidation of the subsidiary debtors was to the parties-in-interest in forming their agreement.

It is clear, however, that courts have found it difficult to sever one piece of a Plan, and have

noted that such a severance might "ignore the tradeoff that allowed the parties to settle in the first

instance and would treat a non-severable provision of the Settlement Agreement as dispensable." Delta, 374 B.R. at 523; see also Texaco, 92 B.R. at 46 (calling it a "common-sense notion" that the "piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions is, in practical terms if nothing else, a virtually impossible task" (internal quotation marks and citations omitted)).  The Bankruptcy Court also noted that "[e]very conceivable alternative to the Plan was investigated by the [Unsecured Creditors'] Committee." Source, 2007 WL 2903954, at *18.  Windels has not presented the Court with an alternative to the Plan that addresses these concerns.

Presuming the Court were able to order effective relief in this case, the second Chateaugay factor asks whether that relief would "affect the re-emergence of the debtor as a revitalized corporate entity." Chateaugay II, 10 F.3d at 953 (quoting In re AOV Indus., Inc., 792 F.2d 1140, 1149 (D.C. Cir. 1986)).  Debtors argue that there is no effective relief that a court could order that would not affect its re-emergence as a revitalized corporate entity, while Windels counters that the primary debtors will still be able to continue to conduct business if their subsidiary companies are not folded into the substantive consolidation.  The Bankruptcy Court considered Windels argument that the subsidiary debtors were stand-alone entities, and found that although Enterprises and Entertainment signed separate retainer agreements with Windels, Windels had acknowledged that BE/GS had "run the entire company as a single entity since 2006." Source, 2007 WL 2903954, at *19.  Windels had not produced evidence that it had ever been paid by a Source entity other than Enterprises, and, in fact, no evidence was introduced below that other Source entities ever made payments to creditors.  Id. at *19-20.  Furthermore, the Court found that Windels knew that the debtors had the same officers, directors and shareholders; conducted the same general business operations; and engaged in inter-company

dealings without corporate formalities.  Id. at *20.  Based on those unchallenged facts, Windels'

claim that the subsidiary debtors could be exempted from the substantive consolidation without

harming the ability of the primary debtors to emerge from bankruptcy as a revitalized concern

seems impracticable.  Windels contends, however, that the bankruptcy proceedings and the

Reliance Actions were never intended to revitalize the appellees as a corporate entity but instead

were a means by which BE/GS could obtain control over the debtor companies at a fraction of

their worth.  Again, the Bankruptcy Court considered this argument, and found that Windels put

forth no evidence that debtors acted in bad faith in proposing the Plan, and that "given the

sophistication of and compromise by Textron and the Creditors' Committee, it [was] simply not

credible to suggest that BE/GS ha[d] manipulated the process to its advantage and to the

detriment of other creditors."  Id. at *19.  Windels has highlighted no evidence on appeal that

would lead this Court to conclude differently.

Even if Windels had clearly delineated the relief that the Court could order, and even if

that relief could be ordered without jeopardizing the ability of the debtor to emerge as a

revitalized corporation, Windels would still have to address the third Chateaugay factor, as to

whether the relief would "unravel intricate transactions so as to knock the props out from under

the authorization for every transaction that has taken place and create an unmanageable,

uncontrollable situation for the Bankruptcy Court."  Chateaugay II, 10 F.3d at 953 (internal

quotation marks and citation omitted).  Although Windels argues that relief could be effected

without harming the parties-in-interest other than BE/GS, that is not the case.  A substantial

number of the transactions that were to occur as a result of the Plan have occurred.  All the

transfers of property have occurred, and distributions of money and stock, or both, have been

made to Textron and to the Creditors' Trust.  The debtor has paid other creditors more than $1.4

million and is conducting business as a reorganized entity. (Id.) Windels does not set forth how

the relief it seeks could be granted without unraveling the Plan, and the Court sees no reason to

disturb the Bankruptcy Court's findings on this score.

The fourth Chateaugay factor asks whether "the parties who would be adversely affected

by the modification have [had] notice of the appeal and an opportunity to participate in the

proceedings." Chateaugay II, 10 F.3d at 953 (internal quotation marks and citation omitted).

Appellees claim that Windels did not present the parties-in-interest who would be adversely

affected with an opportunity to participate in the proceedings, and Windels has not disputed this.

Thus, this factor weighs in favor of a finding that the appeal is equitably moot.

The fifth Chateaugay factor is "whether the appellant pursued with diligence all available

remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a

situation rendering it inequitable to reverse the orders appealed from." Id. (citations and quotation

marks omitted). Windels did not attempt to obtain a stay of execution of the order of

confirmation. Seeking a stay is of the "utmost importance to an appellant desiring to preserve an

appeal of a confirmation order." Loral, 342 B.R. at 141 (citing Metromedia, 416 F.3d at 144).

Because Windels failed to seek a stay, the Court must then consider "whether that . . . failure

renders relief inequitable." Metromedia, 416 F.3d at 144. The Second Circuit has written that

"[i]n the absence of any request for a stay, the question is not solely whether we can provide relief

without unraveling the Plan, but also whether we should provide such relief in light of fairness

concerns." Id. at 145. Here, the relief sought by Windels is substantial—it seeks to undo the

substantive consolidation, to reclassify creditors, and to have portions of the Plan deemed to

violate the Bankruptcy Code. As the Bankruptcy Court explained, larger creditors such as

Textron and the Unsecured Creditors' Committee made significant concessions when agreeing to

the Plan. Source, 2007 WL 2903954, at *18-19. Indeed, without Textron's consent to the concessions, Windels would not receive any payment whatsoever, as Textron was a secured creditor owed more than the sum of debtors' assets. Id. at *19. As a result, this Court "cannot predict what will happen if this settlement is in any part altered," and "[h]aving sought no stay of the bankruptcy court's order (and no expedited appeal), appellant[] bear[s] the burden of this uncertainty." Metromedia, 416 F.3d at 145; see also Texaco, 92 B.R. at 46.

The following considerations lead the Court to conclude that the equities lay with supporting the interest of finality here: the Bankruptcy Court's findings that "the Debtors' books and records are incapable of being 'untangled' from one another, and that creditors, as well as the Debtors themselves, have dealt as though the Debtors are a single entity," Source, 2007 WL 2903954, at *5; the completion of the Reliance Actions; and Windels' failure either to set forth how relief could be effectively granted or to seek a stay. See Chateaugay I, 988 F.2d at 325 ("[T]he ability to achieve finality is essential to the fashioning of effective remedies."). Windels' appeal is thus barred by the doctrine of equitable mootness.

B. Merits

Despite the fact that Windels' appeal is equitably moot, the Court will consider the merits as well in the interest of "sound judicial administration." See Resolution Trust Corp. v. Best Prods. Co., Inc., 68 F.3d 26, 30 (2d Cir. 1995); see also Metromedia, 416 F.3d at 144. Even considering the merits, Windels would not prevail.

1. Substantive Consolidation

Substantive consolidation results in the pooling of multiple entities' assets and claims, which allows those entities to satisfy their liabilities from a common fund, to eliminate inter-company claims, and to combine the entities' creditors for purposes of voting on reorganization

plans.  See Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515, 518 (2d Cir. 1988).  Its "sole purpose" is "to ensure the equitable treatment of all creditors," and it is to be used "sparingly."  Id.  Two factors are considered "critical" in assessing whether substantive consolidation is appropriate: "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit . . . ; [and] (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." Id. (internal quotations and citations omitted); see also In re Leslie Fay Cos., Inc., 207 B.R. 764, 779-80 (Bankr. S.D.N.Y. 1997).  In determining whether entities should be consolidated, courts will consider a number of factors, including whether the entities share costs or obligations; fail to observe corporate formalities; or, in the case of a subsidiary and parent, fail to act independently. See In re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992); see also In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) (articulating principles courts should consider when engaging in substantive consolidation analysis).

Windels posits that neither Augie/Restivo factor was made out because each of the debtor entities was formed for its own purposes, maintained its own creditor body, conducted business independently of the primary debtors, and incurred its own legal expenses.  Furthermore, Windels points to testimony by Jeffrey Scott, Chairman of the Board of Enterprises and Entertainment and Managing Director of BE/GS that "the company was bifurcated into two different corporations, Source Entertainment and Source Enterprises" (Tr. of Confirmation Hearing dated Sept. 27, 2007 ("Sept. 27 Tr.") at 236:23), and that Textron "lent money to probably at least two companies" (Sept. 28 Tr. at 19:13).  Windels notes that when it was retained to represent certain Source entities, the board of directors required appellant to execute two separate retainer agreements, one for Entertainment and one for Enterprises.  Finally, Windels argues that

the consolidation would not benefit all creditors; specifically, Windels is prejudiced because the primary and subsidiary entities will not have to pay legal fees owed to it.

As to the first Augie/Restivo factor, the record reflects that creditors, including Windels, dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit. Since at least 2004, the debtors had operated as a single economic entity, and all of the economic activity of debtors was maintained only on Enterprises books and records. (Decl. of David Berliner in Support of Confirmation of the Fourth Amended Plan of Reorganization of the Source Debtors ("Berliner Decl.") at ¶ 16.) The President and CEO of debtors, Jeremy Miller, testified that the debtors were treated "all as one company." (Sept. 27 Tr. at 63:24.) Creditors also used the various debtors' names interchangeably and regarded the debtors as a single economic entity. (Decl. of Jeremy Miller in Support of the Fourth Amended Plan of Reorganization of the Source Debtors ("Miller Decl.") at ¶¶ 29-32.) One of Windels' lead attorneys, Charles Simpson, acknowledged that the debtors were "run . . . as one," according to him, under BE/GS's leadership since at least 2006—the same year that Windels began representing debtors. (Sept. 28 Tr. at 18:20, 127:5-10.) Simpson also acknowledged that most—although not all—of the subsidiary debtors consisted of nothing more than "minute books" on a shelf. (Id. at 127:16-128:1.) The Bankruptcy Court credited this evidence in finding that the debtors had shown a "substantial identity between the entities to be consolidated." Source, 2007 WL 2903954, at *20. Moreover, as previously discussed, the Bankruptcy Court noted that Windels knew that the debtor entities were run as one company without observing corporate formalities and that all of the finances were handled through Enterprises. Id. Based on the record, the Court does not find the Bankruptcy Court's factual finding to be clearly erroneous, and finds that the first Augie/Restivo factor has been met.

As to the second <u>Augie/Restivo</u> factor, commingling "can justify substantive consolidation only where the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors . . . or where no accurate identification and allocation of assets is possible." <u>Augie/Restivo</u>, 860 F.2d at 519. Although the record here contains evidence that supports the Bankruptcy Court's conclusion that the debtors' books could not be untangled (<u>see</u> Berliner Decl. ¶ 17; Miller Decl. ¶ 30); <u>Source</u>, 2007 WL 2903954, at *5, Windels asserts that the records were not, in fact, tangled, pointing to the facts that:  (1) unsecured creditors of Enterprises provided goods or services only with respect to <u>The Source</u> magazine, and (2) a subsidiary debtor, Source Media and Merchandising ("Merchandising"), had only two creditors—Windels and the McMillan Firm.

The question, of course, is not whether some affairs were not entangled, but rather whether the commingling in this case was so pervasive that "the time and expense necessary even to attempt to unscramble" the debtors' books would be "so substantial as to threaten the realization of any net assets for all the creditors . . . or where no accurate identification and allocation of assets is possible." <u>Augie/Restivo</u>, 860 F.2d at 519. Windels points to two Second Circuit cases—<u>Augie/Restivo</u> itself and <u>In re 599 Consumer Electronics, Inc.</u>, 195 B.R. 244 (S.D.N.Y. 1996)—to support its position.  Neither does.

In <u>Augie/Restivo</u>, where consolidation was not allowed, two companies effected a failed merger; one entity was not dissolved and its property had been used to guarantee two different loans—one to the merged entity and one to the separate entity—both guaranteed by the separate entity's property.  <u>Id.</u> at 516-19.  Those facts differ from the case at bar, where instead of two separate companies effecting a failed merger, debtors' companies were all run as one, and creditors knew that Enterprises was the main entity even if they, like Windels and Textron,

17

signed agreements with more than one entity. Furthermore, in this action, the substantive

consolidation does not benefit one creditor at the expense of another because even without

substantive consolidation, Windels' debt would be subordinated to Textron's in each of the

entities, and it like all of the other unsecured creditors would not receive any payments.

In the second case relied upon by Windels, In re 599 Consumer Electronics, Inc., the

Bankruptcy Court had not considered the second Augie/Restivo factor at all, and the district

court remanded for a determination as to "whether the affairs of the debtors are so entangled that

consolidation [would] benefit all creditors." 195 B.R. at 250-51 (quoting Augie/Restivo, 860 F.2d

at 518.). Here, the Bankruptcy Court here did consider the issue and made a finding based on

evidence in the record, and those findings were not clearly erroneous. Furthermore, the

Bankruptcy Court's analysis was in-depth with respect to its finding that all creditors would

benefit from a substantive consolidation, especially because under any other iteration of the Plan,

all of the creditors would be subordinated to Textron. Source, 2007 WL 2903954, at *19.

Based on the evidence in the record, the Court finds that Windels has not shown that the

Bankruptcy Court's findings of fact were clearly erroneous. Thus, this Court adheres to the

Bankruptcy Court's determination that substantive consolidation is appropriate.

### 2. *Corporate Governance Requirements*

"[T]he initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is

left to the corporation itself, i.e. to those who have the power of management." Price v. Gurney,

324 U.S. 100, 104, 65 S. Ct. 513, 89 L. Ed. 776 (1945). State law governs who has the "power of

management." In re Stavola/Manson Elec. Co., 94 B.R. 21, 24 (Bankr. D. Conn. 1988); see also

In re Am. Globus Corp., 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996). Under New York law, it is

the board of directors that has that authority, see In re Jefferson Casket Co., 182 F. 689

(N.D.N.Y. 1910), assuming the bylaws are not in contradiction, see Am. Globus, 195 B.R. at

265; see also Adorn Glass & Venetian Blind Corp. v. Herbst (In re Adorn Glass & Venetian

Blind Corp.), 2004 Bankr. LEXIS 2411, at *13-14 (Bankr. S.D.N.Y. 2004).

 Nevertheless, the "determination as to whether to honor corporate formalities is an

equitable one, and courts should not sanction a perversion of the privilege to do business in a

corporate form." Am. Globus, 195 B.R. at 265 (internal quotation marks and citations omitted).

In making the determination as to whether a particular director or directors had the authority to

file a bankruptcy petition, the court should undertake "a fact-sensitive inquiry" that asks whether

the corporation "requires the board of directors to follow corporate formalities in order to take

specific actions on behalf of the company," and whether the corporation is "closely held . . . , and

therefore does not hold itself or its shareholders/directors to the rigors imposed by corporate

formalities with respect to any issue." Adorn Glass, 2004 Bankr. LEXIS 2411, at *12-13 (internal

quotation marks and citation omitted).

 Windels argues here that the corporate governance requirements were not met because

the bankruptcy petitions of Enterprises and Magazine were filed by BE/GS, but without the

approval of David Mays—the sole shareholder of Enterprises and Entertainment—or Raymond Scott—a

member of debtors' board of directors.  It contends that because the debtors' by-laws state that

action by these corporations can only be taken through a meeting of the board or on unanimous

consent of all the board members (Amended and Restated By-Laws of Source Enterprises, Inc.,

Ex. C to Windels Obj., at § 3.8), the petitions filed by Entertainment and Magazine are invalid

and should be dismissed.  Windels also contends that the boards of the subsidiary debtors—which

are governed by LLC agreements—should have called a meeting and voted to have those entities

file petitions as well, and the failure to do so means that those entities were not properly entered into bankruptcy.

The Bankruptcy Court addressed the allegations in the objections by Windels and by Mays that the debtors were acting in bad faith by filing bankruptcy petitions without a vote of the full board. That court found, based on testimony by Jeffrey Scott, that efforts to notify Mays and Raymond Scott of pending board meetings and actions were adequate, and that even if Mays were not properly notified, the fact that he was raising that issue for the first time in his objection to the Plan, despite his constant involvement throughout the course of the action, was "disingenuous." Source, 2007 WL 2903954, at *20. Similarly, the Bankruptcy Court noted that neither Mays nor Windels ever sought to have the bankruptcy cases dismissed because Mays and Raymond Scott had not approved the filing of the bankruptcy petitions. Id. Finally, the Bankruptcy Court found that Mays ratified the board action—if it were improper—by remaining silent. Id.

Windels provided the Court with no evidence that the debtors did not attempt to notify Mays and Raymond Scott about board actions, and no evidence that Mays and Windels did move earlier in the litigation to dismiss the bankruptcy actions due to their being brought without board approval; this Court therefore affirms the Bankruptcy Court's findings. The Court has also not been presented with any evidence that the BE/GS acted in bad faith in filing bankruptcy petitions for those entities. Finally, the Court has already affirmed the Bankruptcy Court's finding that the subsidiary entities were run as one with the primary entities. Therefore, even if there were a defect with how the bankruptcy petitions were filed as to the primary or subsidiary debtors, the Court agrees with the Bankruptcy Court that the equities in this case—involving a closely held company with many entities that did not adhere to corporate formalities—lead to the conclusion

that the board's actions were proper.  See Adorn Glass, 2004 Bankr. LEXIS 2411, at *12-13; Am. Globus, 195 B.R. at 265.

### 3.  Creditors with Dissimilar Claims

Section 1122(a) of the Bankruptcy Code requires equal treatment of claimants as follows: "[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Moreover, "[a] plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar." See Drexel Burnham Lambert, 138 B.R. at 757.

Windels believes that the Plan violates section 1122 because of its classification of unsecured claims of each of the individual debtor estates.  It contends that the general unsecured creditors should not all be lumped together because each creditor provided goods and services to the debtor entities based on the particular business in which that debtor engaged.  For example, the McMillan Firm and Windels were the only two creditors of Merchandising, and thus Windels asserts that it is improper to classify the McMillan Firm and Windels with all the other creditors with respect to Merchandising.

The Bankruptcy Court found that the requirements of section 1122(a) were met because each class of claims contained only claims that were substantially similar to one another and because there was a reasonable basis for the classifications in the Plan.  Source, 2007 WL 2903954, at *5.  Because the debtors operated as a single economic entity and because the classifications did not discriminate among holders of claims or equity interests, these findings of fact were not clearly erroneous.  See Drexel Burnham Lambert, 138 B.R. at 757, 767.  The

classification scheme also furthers the reorganization of the debtors in light of the substantive consolidation.

### 4. Creditors in Same Class Treated Differently

Section 1123(a)(4) of the Bankruptcy Code requires equal treatment of claimants in the same class and states as follows:

> Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . . .

11 U.S.C. § 1123(a)(4).  Moreover, a plan should be confirmed only if it comports with the applicable provisions in the Bankruptcy Code, including section 1123.  See 11 U.S.C. § 1129(a).

Windels argues that the Plan violates section 1123(a)(4) through its treatment of the McMillan Firm's claim.  The McMillan Firm, like Windels, provided pre-petition legal services to a number of the subsidiary debtors and to Enterprises and Entertainment, and filed a proof of claim for approximately $500,000 in the Chapter 11 cases.  The McMillan Firm also filed objections to earlier versions of the Plan.  In September 2007, however, the McMillan Firm withdrew its objections to the Plan.  (Notice of Withdrawal of Objections of L. Londell McMillan P.C. and Agreement to Sell Reorganized Source Common Stock dated Sept. 20, 2007 ("McMillan Withdrawal") at ¶ 2.)  In the notice of withdrawal, the McMillan Firm and BE/GS also announced that Northstar—a company of which L. Londell McMillan was a principal—and BE/GS had agreed that BE/GS would sell Northstar a minimum of nine percent of the common stock of the reorganized debtors for a minimum initial purchase price of $1 million.  (Id. ¶¶ 2-3; see also Term Sheet dated Sept. 19, 2007 ("Term Sheet"), Ex. A to McMillan Withdrawal.)  The agreement also gave Northstar the right to designate at least one director of the reorganized debtor's board (Term Sheet at 1), and Northstar intends to designate McMillan, Source, 2007 WL 2903954, at

*5.  BE/GS did not make this offer to any other general unsecured claimant.  (Sept. 28 Tr. at 71:2-11.)  Windels therefore asserts that the McMillan Firm's claim was treated differently from its own, in violation of sections 1123(a)(4) and 1129.

The Bankruptcy Court found that the requirements of section 1123(a)(4) were met because the agreement was not an attempt to treat the McMillan Firm differently from other unsecured creditors.  Source, 2007 WL 2903954, at *20.  The agreement was between two third parties, and the debtors are not a party to the agreement.  Id.  The Bankruptcy Court found that those third parties agreed that McMillan had "unique industry experience, which [would] enhance the reorganized debtor's business prospects and operational efficiencies." Id.  Debtors explain that the opportunity afforded to McMillan was not made available to other third parties or creditors because none presented "a likely potential to add value to the reorganized debtor in a way that is similar and accretive to the value that Mr. McMillan [was] anticipated to provide." (Decl. of Jeffrey C. Scott in Support of Confirmation of the Fourth Amended Plan of Reorganization of the Source Debtors dated Sept. 26, 2007 ("Scott Decl.") at ¶ 18.)

Debtors claim that McMillan being offered this "opportunity" "had nothing to do with the fact that Mr. McMillan also happened to be a principal of one of the Debtors' creditors." (Opp. Br. at 26.)  This Court need not concern itself with that contention, however, because the agreement complained of here is an agreement between third parties—despite the fact that both third parties are related to parties to the action—and does not affect the treatment of the McMillan Firm's claims as compared to any other general unsecured creditor under the Plan.  See 11 U.S.C. § 1123(a)(4).  Thus, the Bankruptcy Court's determination that the Plan comports with section 1123 of the Bankruptcy Code is affirmed.

5.   *Plan Modification Led to Disparate Treatment*

Section 1127 of the Bankruptcy Code provides that a plan can be modified, but not in such a way that the plan fails to meet the requirements of sections 1122 and 1123.[3]  The section should be read in conjunction with Bankruptcy Rule 3019, which provides:

> In a chapter 9 or 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019.

---

[3] Section 1127 provides in relevant part:

> (a) The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

> (b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

> (c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

> (d) Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

> . . .

> (f)(1) Sections 1121 through 1128 and the requirements of section 1129 apply to any modification under subsection (a).

> (2) The plan, as modified, shall become the plan only after there has been disclosure under section 1125 as the court may direct, notice and a hearing, and such modification is approved.

11 U.S.C. § 1127.

Windels asserts that because the deal between BE/GS and Northstar was struck after the Fourth Amended Disclosure Statement was filed (see Sept. 27 Tr. at 71:2-4), the agreement was an improper modification of the Plan that changed the treatment and rights of McMillan under the Plan. Windels also alleges that BE/GS violated section 1127(c) by failing to comply with section 1125 by providing inadequate information about the modification. Windels asserts that the McMillan Firm's treatment changed because Northstar was given rights with respect to, inter alia, purchasing additional shares in the reorganized debtor; employing management and professionals; appointing board members and voting; and vetoing licensing of the Source's trademark. Therefore, Windels argues, pursuant to Bankruptcy Rule 3019, the Court should have held a hearing to determine the adequacy of notice and whether the modification changed the treatment of the creditors other than the McMillan Firm.

The Bankruptcy Court found that the agreement between Northstar and BE/GS was prospective and was not a modification of the Plan. Source, 2007 WL 2903954, at *20. Because, as previously discussed, the agreement was between two third parties and took effect after the Effective Date, it did not modify the Plan. Cf. Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197, 204 (3d Cir. 2003) (explaining that it is the impact of the plan on creditors that matters, not the impact of a statute or other issues outside of the bankruptcy, and stating, '[a] plan which 'leaves unaltered' the legal rights of a claimant is one which, by definition, does not impair the creditor'). The Bankruptcy Court's determinations that the Plan was not modified by the agreement between BE/GS and Northstar, and thus that the Plan was in accordance with section 1127 of the Bankruptcy Code, are therefore affirmed.

## IV.    CONCLUSION

Because Windels can not overcome the presumption that this appeal is equitably moot, the Court need not reach the merits of its appeal. Nevertheless, the Court finds that Windels' appeal fails on the merits as well. Accordingly, the Bankruptcy Court's Order dated October 1, 2006, is affirmed in all respects.

Dated: New York, New York
        August 12, 2008

SO ORDERED:

Sidney H. Stein, U.S.D.J.